102 N.J. Super. 549 (1968)
246 A.2d 460
OXFORD CONSUMER DISCOUNT COMPANY OF NORTH PHILADELPHIA, A CORPORATION, PLAINTIFF-RESPONDENT,
v.
ANTHONY E. STEFANELLI AND THERESA A. STEFANELLI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 17, 1968.
Decided September 11, 1968.
*552 Before Judges CONFORD, LABRECQUE and HALPERN.
Mrs. Annamay T. Sheppard argued the cause for appellants.
Mr. Herman J. Ziegler argued the cause for respondent.
Mr. Douglas J. Harper, Deputy Attorney General, argued the cause for Attorney General, intervenor (on side of defendants) (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney; Mr. William J. Brennan, III, Assistant Attorney General, of counsel).
Mr. Steven S. Radin argued the cause for Middle Atlantic Finance Association, as amicus curiae (Mr. Clive S. Cummis, attorney; Mr. Michael B. Tischman, on the brief).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This appeal presents important questions relating to the validity and applicability to plaintiff, a Pennsylvania loan company not authorized to do business *553 in New Jersey, of the Secondary Mortgage Loan Act of 1965 (L. 1965, c. 91, N.J.S.A. 17:11A-1 et seq.),[1] and regulations of the Commissioner of Banking and Insurance promulgated pursuant thereto, more specifically in respect of its loan to defendants, residents of New Jersey, secured by a second mortgage on their Newark home. The Attorney General has been granted leave to intervene on the side of defendants to defend the validity of the act and regulations; and Middle Atlantic Finance Association to file a brief amicus curiae, which has been helpful. It has also participated in the oral argument.
The Superior Court, Law Division, granted summary judgment for $5,071.82 in favor of plaintiff in its action on a note executed June 6, 1966 by defendants at the Philadelphia office of plaintiff and there delivered to it, that transaction being purportedly authorized by the Pennsylvania statute, Tit. 7, Purdon's Pa. Stat., §§ 6201-6219 ("Consumer Discount Company Act"). At the same time the court denied defendants' motion for summary judgment. Enforcement of the mortgage taken as security for the loan at the same time the note was delivered was not sought or involved in the action.
Although the scope of defenses to the action now advanced is not identical with those set forth in the original pleadings, we have concluded that the questions of public policy implicated in the appellate arguments are so significant and the desirability in the public interest of present judicial determination thereof so obvious that we ought to decide all relevant legal questions argued on the appeal insofar as the record permits us to do so. None of the parties has contended for a narrower approach.
Basically, defendants and the Attorney General argue that the Secondary Mortgage Loan Act of 1965 is applicable to this transaction; and that there were several violations of *554 that act in the course of the transaction, thereby calling into play section 29 of the act precluding enforcement in the courts of this State of any obligation arising out of a secondary mortgage loan not negotiated and made in full compliance with the provisions of the act. Defendants also contend there was fraud by plaintiff in that they were not advised and did not know that the papers they signed included a mortgage on their home.
Plaintiff asserts the New Jersey statute does not and constitutionally cannot apply to this transaction; that the loan was valid under the Pennsylvania statute regulating such transactions; that conflict of laws principles call for application of the Pennsylvania rather than the New Jersey statute in resolving the validity and enforceability of the loan, and that denial of enforcement of the cause of action by New Jersey would violate the due process, equal protection, interstate commerce and full faith and credit clauses of the United States Constitution.

I. Legislative Background
The Secondary Mortgage Loan Act of 1965 emerged as a compromise of proposals embodied in three bills in the 1965 session of the Legislature, Assembly Nos. 522 and 732, and Senate No. 244. Its adoption was preceded by widespread complaints to the authorities concerning false and fraudulent advertising of the availability of loans and terms thereof and the exaction of exorbitant rates of interest and concomitant other charges from needy borrowers. Typically, the lenders in these transactions required the furnishing by borrowers of mortgages on their homes as security, and generally the financial difficulties of the borrowers were such that the mortgages given were necessarily junior liens to existing mortgages on their properties.
These conditions were fully documented in a report dated January 5, 1965 from the Secretary-Director of the New Jersey Real Estate Commission to Governor Hughes concerning *555 the results of an investigation by the Commission of these abuses. Significant in relation to some of the legal questions presented herein is the statement in said report: "Our review showed that, in most cases, the New Jersey second mortgage operator would contact or be contacted by a financial outlet, usually in the Philadelphia area, where money was available for second mortgages if a specific procedure was followed." The report showed that the customary procedure involved the use of New Jersey-based brokers, who made contact with or were approached by New Jersey prospective borrowers, in the latter instances usually as a result of advertisements. The broker then would bring the borrower to the financing loan company for consummation of the transaction, frequently in such nearby but out-of-state locations as Philadelphia.
In approving the bill as enacted Governor Hughes publicly stated:
"Assembly Bill No. 732 represents a major step forward in the vital area of consumer protection. With the enactment of this bill, New Jersey maintains its place in the forefront of States which have been quickest to recognize and curb the activities of those who would prey upon the public under the guise of legality and respectability. New Jersey once again has branded unethical conduct as unlawful conduct in order to protect its citizens from the hardships of exorbitant financial practices."

II. The Act and Regulations
The act defines a "secondary mortgage loan," in effect, as a loan not to be repaid in 90 days or less which is secured by a mortgage on real property used as a dwelling for not more than four families, which property is subject to the lien of a prior mortgage or mortgages, or the purchase of any interest in such a loan. Section 1 (a). The business of making such loans is restricted to licensees qualifying under the terms of the act. Section 2. The holders of 50% of the stock in a corporate licensee, and any individual licensee, must have resided in this State for two years prior to *556 applying for a license. Section 3. There are detailed provisions concerning procedure on applications for licenses and renewals thereof to the Commissioner of Banking and Insurance, including payment of an annual fee of $25 and filing a corporate surety bond of $5,000. Sections 4 et seq. Licensees must indicate the location of "the office or branch," Section 7; and the application, if by a corporation, must state "where the business is to be conducted," section 4. There are provisions for hearings on refusals, suspensions or revocations of licenses. Section 11. The Commissioner may investigate activities, and examine books and records, section 14, which must be maintained by the licensee at its place or places of business in this State, section 17.
Section 21 sets forth a mathematical formula for ascertaining the gross dollar amount of interest which the lender may deduct in advance from the face amount of the loan, given the predetermined net proceeds of the loan to be made available to the borrower on closing and the number of installment payment periods for the whole term of the loan and for any calendar year. The parties agree that the formula produces about 14% simple interest per annum on outstanding unpaid principal balances.[2]
Maximum incidental charges which may be made by the lender in respect of "costs, fees, services, points and premiums" are specified as: appraisal and inspection  $50 per parcel of land mortgaged; credit investigation  $15; search fee  $50 per parcel; legal fees  5% of amount of loan, not exceeding $250; recording and filing fees, not to exceed $5 per document. Section 22. Borrowers may not be required to pay any fee for the procuring or placement of the loan, but such fees may be paid by the lender to an attorney or licensed realty broker. Id., subsection (b). The borrower "shall not be compelled to purchase" from the licensee fire, life or title insurance policies. Id., subsection (c).
*557 Among a variety of kinds of provisions which may not be included in any loan instrument are a power of attorney of any kind, including any power to confess judgment and any provision whereby the debtor waives any rights accruing to him under the act or any other law. Section 23.
The act is not applicable to banking institutions, savings banks, federal savings and loan associations or any "insurance company or other financial institution * * * subject to any other law of this State or the United States" regarding mortgage loan transactions by such institutions. Section 31.
We have already mentioned section 29, which declares that no obligation arising out of a secondary mortgage loan shall be enforceable in the courts of this State unless negotiated and made in full compliance with the provisions of the act.
Other unmentioned provisions of the act are not implicated in the issues here raised.
Pursuant to his rule-making power under section 30 of the act, the Commissioner of Banking and Insurance has promulgated a set of rules, two of which are involved in this litigation. The first is Rule 1, reading:
"Notwithstanding the place of execution, nominal or real, of a secondary mortgage loan, if the real property is located in this State, said secondary mortgage loan will be deemed to be subject to the Secondary Mortgage Loan Act of 1965 * * *."
The second is Rule 5(d), under which the lender is required to notify the borrower in writing that he has the right to the advice of counsel of his own choosing before signing the loan papers.

III. The Instant Transaction
Most of the pertinent facts are undisputed; the parties disagree as to others. We propose to decide this appeal on certain of the material facts which are palpably free of any genuine issue and suffice as a matter of law to dictate judgment for defendants. Certain of the undisputed facts have *558 already been related. Some of the assertions as to disputed facts will be mentioned as enlightening background.
Defendant Anthony E. Stefanelli made two affidavits in resistance to plaintiff's motion for summary judgment, alleging the following. Prior to June 6, 1966 (when he made the loan) he was "contacted by a brokerage firm in South Jersey who asked [him] whether [he] needed a loan as [he] had accumulated some debts which [he] wanted to consolidate. Shortly thereafter [he] was contacted by Rodney Radhill, of 1401 Reed Street, Philadelphia, who informed [him] that he would be able to procure the money for [him]." On June 6 Radhill took him to plaintiff's office where he executed several papers, including a mortgage on his home. However, it was not stated before or during the transaction that this involved a mortgage, and defendant did not "believe" this was a mortgage transaction at any time. After he received the net proceeds of the loan ($937.34; this was the balance after payment during closing by lender of certain of defendant's prior obligations in addition to prepaid interest and other charges on the loan; see infra), Radhill cashed the check and retained $350 thereof as the price of a small portable television set he "sold" defendants, explaining he was not allowed to charge a brokerage commission for a loan. Only after he received, at a later date, a statement of the loan, did Stefanelli realize he had executed a mortgage on his home. Stefanelli further asserted in his affidavit that he was "compelled" to purchase creditor life insurance and creditor accident-health insurance, the premiums therefor having been "incurred" over his objections.
Plaintiff's sole evidential showing on the motion as to Radhill's part in the transaction is an affidavit of its manager that "Plaintiff does not have and never had an agent by the name of Rodney A. Radhill and plaintiff made no requirement for defendants to purchase anything from anyone in order to obtain the loan." However, plaintiff failed to answer responsively an interrogatory requesting it to state who was present at the loan closing.
*559 There is no dispute that defendants did on June 6, 1966 at the Philadelphia office of plaintiff sign and deliver to it a promissory note in the amount of $4,535.28 payable in 36 monthly installments of $125.98 each, beginning July 6, 1966, and also a second mortgage on their Newark home as collateral security for the note. The note contained a power of attorney for entry of judgment thereon. It is conceded there were deductions from the face amount of the note of $1,020.43 for interest, $15 for service charge, creditor life insurance and creditor accident and health premiums of $102.05 and $145.13, respectively, and recording and releasing fees of $6.25. The amount of allowable interest under section 21 of the New Jersey act would have been some $758. Plaintiff says it did not "compel" defendants to buy the insurance. From the loan proceeds plaintiff at the direction of defendants paid their existing debts: $500 to Household Finance Corp.; $500 to Central Finance; and $1,309.08 to Geraldine Sica; leaving a balance of $937.34 disbursed to defendants (from which they paid $350 to Radhill for the television set, as noted above).

IV. The Pennsylvania Statute
The subject matter regulated under the Consumer Discount Company Act (cited above) is the business of lending sums of $3,500 or less (whether secured or unsecured) and charging interest and fees which aggregate more than 6% per year on unpaid principal balances. Tit. 7, Purdon's, op. cit., § 6203. Such business is restricted to Pennsylvania corporations licensed by the Secretary of Banking. Ibid. Supervision of licensees is comprehensive and comparable to that provided for by the New Jersey act. The amount of interest chargeable is formulated differently from the New Jersey act. It is fixed at $7.50 per $100 per year when the "contract is repayable" within 36 months; if for a longer term, then at $6 per $100 for the remainder of the term. Such interest is computed on the face amount of the loan (including all *560 permissible charges) for the full term of the contract and deductible in advance notwithstanding provision for installment payments.[3]Section 6213, subd. E. By way of comparison with the stated $7.50 rate, the formula set forth in Section 21 of the New Jersey act would permit an amount of interest which, if computed on the Pennsylvania basis for the $7.50 rate, would work out to about $5.90 per $100 per annum.
The Pennsylvania act also allows: service charge up to $15; extension or deferment charges at the rate of 1 1/2% per month on the amount in arrears; actual official recording fees; the premium for insurance required or obtained[4] as security for the loan; attorney's fees and court costs in collection of any contract in default.
Plaintiff argues that comparing allowable interest charges under the New Jersey and Pennsylvania statutes is misleading; that the "cost of money" to the borrower should include the supplemental loan charges, which are potentially heavier in New Jersey. However, the comparison of potential cost of money under the respective statutes will not be determinative, in view of our approach to the issues as developed hereinafter.
We approach the legal questions presented for decision.

V. Residence Requirement  Severability
We have no hesitancy in agreeing with the contention of plaintiff that section 3 of the act, requiring that holders of at least 50% of the stock of a corporate applicant (as well as any individual applicant) for a license shall have been residents of New Jersey for two years prior to the application, *561 is unconstitutional. The Attorney General accepts that proposition, acceding to a 1966 unreported decision of the Law Division to that effect. Defendants have offered no defense of the provision, and we conceive none. No reasonable relationship whatever has been advanced or is perceived between the objects of the legislation and the residence requirement for shareholders of a corporate licensee. The act does not require that licensees must be domestic corporations or that any of their officers, agents or managers be residents. Cf. Osborn v. Ozlin, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940); in respect of such requirements a debatable regulatory justification could perhaps be argued. It seems to us highly likely that section 3 had no motivation other than to favor New Jersey residents engaged in the consumer lending field as against out-of-staters. We conclude that the requirement of residence for shareholders is void as violative of due process and equal protection. In accord: Miskell v. Termplan Incorporated of Houston, 381 S.W.2d 129 (Tex. Civ. App. 1964). There is possibly also implicated the privileges and immunities clause of the United States Constitution, asserted derivatively in this action by plaintiff on behalf of its shareholders. Cf. Hess v. Pawloski, 274 U.S. 352, 355-356, 47 S.Ct. 632, 71 L.Ed. 1091 (1927).
However, defendants and the Attorney General contend that section 3 is severable from the remainder of the act, and that plaintiff continues to be barred from recovery on the note, under section 29, by virtue of violations in this transaction of other still viable provisions of the statute. We agree.
This enactment has no specific severability clause. But that fact is not determinative of the question, particularly in the light of the general, overall severability clause in R.S. 1:1-10. The governing principle in all cases is whether it can be concluded that the Legislature "designed that the enactment should stand or fall as a unitary whole," State by McLean v. Lanza, 27 N.J. 516, 527 (1958). It was further there said:
*562 "[E]ven if there be no such express declaration of separability, an unconstitutional provision in a statute does not affect the validity of a separate article or clause of the enactment, if otherwise valid, unless the two are so intimately connected and mutually dependent as reasonably to sustain the hypothesis that the Legislature would not have adopted the one without the other. Where the principal object of the statute is constitutional, and the objectionable provision can be excised without substantial impairment of the general purpose, the statute is operative except insofar as it may contravene fundamental law. And the question is to be considered in the light of the settled principle that a permissible doubt as to validity is to be resolved in favor of the enactment." (at p. 528)
In particular reference to a regulatory ordinance it has been stated that the ultimate test is whether the ordinance, "stripped of those provisions which are invalid, remains a comprehensive and cohesive regulatory ordinance with appropriate sanctions for its enforcement." Cranberry Lake Quarry Co. v. Johnson, 95 N.J. Super. 495, 517 (App. Div. 1967), certification denied 50 N.J. 300 (1967). We deem this applicable as well to a regulatory statute.
Applying the indicated criteria, we have no doubt that the statute would have been intended by the Legislature to stand, even with the residence requirement of section 3 deleted as void. The legislative background data demonstrates an urgent sense of the necessity in the public interest of close regulation of the operations of the secondary mortgage lending industry to the extent of their effect upon New Jersey residents. All of the statutory policing regulations and the substantive provisions governing permissible interest rates, other charges and other provisions of loan contracts are left functionally intact and operative notwithstanding invalidation of the shareholder-residence requisite of section 3. We therefore hold the statute survives the excision of section 3. See Miskell v. Termplan Incorporated of Houston, supra, 381 S.W.2d, at p. 131.

VI. Conflict of Laws
Plaintiff contends that appropriate choice-of-law principles require the application of Pennsylvania rather than *563 New Jersey law to the question of the validity of this loan; and since the transaction was valid under Pennsylvania law recovery is not to be denied because of transgressions of the New Jersey act. Strong reliance is placed on section 346K, "Contracts for the Repayment of Money Lent," as set forth in Restatement, Conflict of Laws 2d, Tentative Draft No. 6 (1960). This section was substantially adhered to in the reformulation thereof in the Proposed Official Draft, Part II (1968), as § 195 thereof, reading:

"§ 195. Contracts for the Repayment of Money Lent.
The validity of a contract for the repayment of money lent and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made, unless, with respect to the particular issue, some other state has a more significant relationship to the transaction and the parties, in which event the local law of the other state will be applied."
Comment (b) states that in determining whether there is a state with a more significant relationship to the transaction and to the parties, resort should be had to the principles set forth in section 6 (to be found in Proposed Official Draft, Part I (1967)). Subsection (1) thereof, which we think determinative of the instant issue, reads:
"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."
When there is no such directive, various other principles may come into play, including "the relevant policies of the forum." Subsection (2) of section 6. As we deem subsection (1) the guideline which we should follow, not merely because it is embodied in the Proposed Official Draft but for the reason that it is inherently sound, we need not explore the alternative contention of defendants that conflicts principles ordinarily applicable will bow where the result would strongly offend a public policy of the forum state or where the preponderance of the significant contacts with the transaction *564 are situate there. See HIMC Investment Company v. Siciliano, 103 N.J. Super. 27 (Law Div. 1968), where the instant act was held applicable to a transaction entered into in Pennsylvania on the basis of such principles, but where New Jersey contacts were more pronounced than here. See Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 492-493 (1961).
Defendants contend that section 6, subsection 1, of the Restatement, supra, finds present application in that New Jersey has expressly ordained that the Secondary Mortgage Loan Act should apply to all such loans where the secondary mortgage exacted is on property situate in this State, no matter where the loan contract is executed  in other words, settled the choice of law problem involved. They refer to Rule 1 of the regulations promulgated by the Commissioner of Banking and Insurance, which is to that effect. However, we cannot agree that the Commissioner would have authority under his delegated rule-making power (under section 30, to make such rules "as shall be necessary to the establishment and maintenance of a standard of fair, equitable and honest conduct in the transaction of secondary mortgage loans") to promulgate a choice-of-law rule if the statute contained no such provision, express or implied. This is a rule of substantive law, not an administrative implementation of regulatory policies broadly reflected in the language of the statute itself. "The distinction is between the making and the execution of the law." Abelson's, Inc. v. New Jersey State Board of Optometrists, 5 N.J. 412, 423-424 (1950).
But we do agree with the alternative argument of defendants that the statute, in the light of its avowed objectives, particularly as illuminated by the legislative history, evinces an unmistakable intent that any secondary mortgage loan, as defined in the act, made by a New Jersey resident involving New Jersey realty be subject to the act notwithstanding execution of the loan documents out of the state and in favor of a foreign corporation. One of the primary evils cited in the investigation preceding adoption of the *565 law, as indicated above, was the enticing of needy New Jersey residents to loan companies in the Philadelphia area. While it is true that the text of the statute does not express any conditions or qualifications of its applicability in terms of the place of making of the loan, the residence of the lender corporation or the borrower, or even the location of the mortgaged property, the manifest purpose of the legislators in enacting, and of the Governor in approving, this statute was to protect New Jersey residents from overreaching mistreatment of them by out-of-state as well as local lenders taking back secondary mortgages on New Jersey residential real property.
Legislative intent can be discerned by background circumstances revealing the evil sought to be remedied and as thus illuminated may be read into the statute by implication with the same effectiveness as though expressly declared therein. State v. Gill, 47 N.J. 441, 444 (1966); Alexander v. N.J. Power & Light Co., 21 N.J. 373, 379 (1956).
In the official comment (b) to section 6 of the Restatement, Conflict of Laws 2d (1967), supra, the reporter says:
"b. Intended range of application of statute. A court will rarely find that a question of choice of law is explicitly covered by statute. That is to say, a court will rarely be directed by statute to apply the local law of one state, rather than the local law of another state, in the decision of a particular issue. On the other hand, the court will constantly be faced with the question whether the issue before it falls within the intended range of application of a particular statute. The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid." (Emphasis added.)
We have no difficulty, applying these precepts, in ascertaining the legislative intention in this instance to be as formulated above and thus as settling (subject to constitutional questions) the choice-of-law issue here under discussion by implied legislative fiat.
*566 Plaintiff calls to its aid decisions elsewhere which in varying unrelated contexts have held loans or other contracts made outside the forum state to be unaffected by local statutes regulating the doing of business or access to local courts, frequently on federal constitutional grounds, and it argues the Legislature must be presumed not to have intended an unconstitutional result. But this contention begs the present issue  i.e., the actual intent of the New Jersey Legislature as to the subjection to this law of out-of-state loans to New Jersey borrowers, secured by mortgages on New Jersey lands. We deal with the constitutional problems separately hereinafter.

VII. Equal Protection
Plaintiff asserts that the definition of a secondary mortgage loan in the statute establishes an arbitrary classification among holders of promissory notes, not required by the public policy of the State and consequently depriving plaintiff of the equal protection of the laws guaranteed by the Fourteenth Amendment. The position is that there is no rational basis for creating for the special treatment of this act, out of the whole category of mortgage lenders, those whose obligation is secured by a secondary mortgage; nor any basis for including mortgages which are only partially the collateral taken for the loan. But we think it obvious that there is. The investigations which preceded adoption of the act revealed that there was a characteristic syndrome pervading the area of transactions infected by the evil sought to be ameliorated. This consisted of the situation of moderately circumstanced persons owning a home or small multi-family dwelling, already heavily encumbered by a first mortgage, and who, being unable to raise money to meet pressing needs from conventional lenders at ordinary interest rates, were compelled to go to high-interest and premium-exacting lenders who typically tightened their security by exacting a secondary mortgage on the borrower's home.
*567 The question is not whether the act dealt with all facets of the evil but whether, in the light of the end sought, it rationally dealt with any distinct phase of it calling for attention and differentiable on a reasonable basis from any others. David v. Vesta Co., 45 N.J. 301, 314-317 (1965), and cases cited therein. In view of the background data, and mindful of the heavy presumption of constitutionality of legislation, we are satisfied that the legislative classification here impugned is valid.

VIII Due process and Interstate Commerce
Plaintiff and amicus curiae lay major emphasis on the argument that application of the act to the instant transaction creates an undue burden on interstate commerce, in violation of the commerce clause of the United States Constitution. It is also argued that applying the act to loans made outside the state denies due process. It will be convenient to consider these positions together, as the pertinent considerations intermesh.
The complexity of the problems and the infinite variety of factual and policy considerations presented in the whole area of transactions having multi-state aspects has produced much confusion and many divided and inconsistent rulings in the courts, state and federal, over the validity of the efforts of states to regulate local aspects of interstate transactions. "The question as to what is the proper dividing line between the respective powers of Congress and those of the states to regulate commerce has been declared to be the most perplexing and confusing topic in American constitutional law." 15 C.J.S. Commerce § 5, p. 388. That the powers of Congress in regulation of interstate commerce, when exercised, are paramount to and preemptive of those of the states, is elementary. Id., § 6, p. 390. Of more tenuous substance is the rubric that even as to areas not entered by Congress state regulation of the subjects of interstate commerce *568 must not "interfere" with or place "undue burdens" upon such commerce. Id., § 10, pp. 403-404.
The matter was succinctly stated in Neeld v. Giroux, 24 N.J. 224 (1957) (involving stoppage of interstate cargo of cigarettes to investigate possible violation of the New Jersey cigarette tax law):
"A state may protect its local interest by reasonable measures which do not unduly interfere with interstate commerce, in the absence of federal legislation occupying the area." (at p. 228)
And, in upholding legislation regulating the price of milk moving in interstate commerce, the court said, in National Dairy Products Corp. v. Hoffman, 40 N.J. 475 (1963):
"* * * [T]he problem is not whether such [interstate] commerce is interfered with but whether the proved interference constitutes an undue or excessive burden on that commerce. Incidental interference or indirect burdens, which find their source and justification in a reasonable exercise of the police power of a state affected by the transaction, are not transgressive of the United States Constitution, in the absence of some controlling or superseding federal enactment or regulation. Regulation of the price of milk was directed by the Legislature to meet the requirement of local conditions and to protect the public interest from what it found to be the adverse effects of those conditions." (at p. 488)
There can hardly be any question that, prima facie, state regulation of consumer loan practices deleteriously affecting substantial numbers of the citizenry is a fit and proper exercise of local police power notwithstanding any incidental effect on interstate commerce. See Metropolitan Finance Corp. v. Matthews, 265 Wis. 275, 61 N.W.2d 502 (Sup. Ct. 1953), sustaining state licensing procedures for collection agencies in application to an out-of-state firm doing essentially interstate commerce, where the court quoted the following highly instructive language of the Supreme Court in United States v. South-Eastern Underwriters Asso., 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944):
*569 "It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states. In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the state and national interests involved can be accommodated." (at p. 548, 64 S.Ct., at p. 1171, emphasis added)
Similarly, in Union Brokerage Co. v. Jensen, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227 (1944), Mr. Justice Frankfurter wrote:
"Whatever may be the generalities to which these cases give utterance and about which there has been * * * relatively little disagreement, the fate of state legislation in these cases has not been determined by these generalities but by the weight of the circumstances and the practical and experienced judgment in applying these generalities to the particular instances." (at p. 211, 64 S.Ct., at p. 973)
These, we think, are the approaches which should guide us here. New Jersey's strong interest in protecting its citizens from victimization by lenders operating on the other bank of the Delaware, pursuing their activities through co-operative relations with brokers (whether or not technically agents or independent contractors) who effectively negotiate with the borrowers in this State, should outweigh any incidental effect upon the interstate aspects of the transaction, and save the local legislative remedy for the existing abuses from invalidation under either the commerce or due process clauses.[5]
*570 A significant modern decision relevant to this discussion is Robertson v. People of State of California, 328 U.S. 440, 66 S.Ct. 1160, 90 L.Ed. 1366 (1946). Involved was the validity of a state statute requiring any insurance agent, broker or solicitor to obtain a state license, in its application to one soliciting for a foreign insurance company not admitted to do business in the state. The court treated the regulation as one of a series stated in the statute to be "designed and reasonably adapted to protect the public from fraud, misrepresentation, incompetence and sharp practice which falls short of minimum standards of decency in the selling of insurance by personal solicitation and salesmanship." (at p. 447, 66 S.Ct., at p. 1164). In sustaining the validity of the statute whether the agent's acts were regarded as "in" commerce or only as "affecting" it (at p. 448, 66 S.Ct. 1160), the court cited previous Supreme Court decisions sustaining, in the absence of contrary action by Congress, the licensing of agents or brokers for the sale of interstate transportation in order to prevent fraud; trainmen engaged in interstate commerce, to secure their competence; the sale on commission of interstate consignments of farm produce to secure honest dealing and financial responsibility; and the activities of custom brokers to secure responsibility in the state courts on claims arising locally. Ibid.
It would seem that in comparison with the instances just stated, the instant situation is, a fortiori, free from constitutional interdiction on commerce grounds. Indeed, in other phases of its arguments plaintiff contends that this transaction was wholly an intrastate Pennsylvania transaction.
The closest indication available as to how the United States Supreme Court would react to the commerce argument in a case such as this is afforded by the court's dismissal of the appeal in Fairfax Family Fund, Inc. v. California, 382 U.S. 1, 86 S.Ct. 34, 15 L.Ed.2d 6 (1965), "for want of a substantial federal question." The appeal there was from a judgment of the California District Court of Appeal and *571 denial of hearing thereon by the Supreme Court of that state, opinion reported in People v. Fairfax Family Fund, Inc., 235 Cal. App.2d 881, 47 Cal. Rptr. 812 (1965).
In that case the state Attorney General sought an injunction against the conduct by defendant, a Kentucky corporation, of its small loan business in California without securing a license required by the California statute regulating that type of business. Defendant operated entirely by mail between its home office in Kentucky and borrowers resident in other states, maintaining no employees or offices in California  in other words, a straight interstate business. The California court rejected the argument of defendant, based upon the commerce clause, and buttressed by citation of the so-called "drummer" cases, e.g., International Text-Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678 (1910); but see Eli Lilly & Co. v. Sav-On-Drugs, Inc., 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), that the state could not exact a license requirement from a foreign corporation doing purely interstate business with residents of that state. The court noted that the Small Loan Law of California "is legislation designed for the public welfare. It is primarily to protect the citizens of this state from fraudulent and unconscionable conduct of those in the lending business * * * and as such, is a matter of local concern * * *. The degree of regulation contained in the laws of this state with reference to loan sharks is not disproportionate to the evils which exist if the lenders are left to their own devices without licensing and without any regulation by the state" (47 Cal. Rptr., at p. 814); and "Fairfax should not be allowed to escape state regulation merely because it is also engaged in interstate commerce" (Id., at p. 815). Proper regulation of the business was thought to be impossible without the license requirement. Ibid.
Plaintiff and amicus curiae present us with an extended attack upon the soundness of the California opinion in Fairfax Family Fund but fail to deal with the tangible fact that the United States Supreme Court dismissed the loan company's *572 appeal therefrom for want of a substantial federal question. A clue to the reasoning behind the short per curiam of the Supreme Court lies in the more extended discussion in the dissenting opinion of Mr. Justice Douglas. That emphasizes the "drummer" cases as representative of the there asserted view that "our decisions have heretofore precluded a State from exacting a license of a firm doing an exclusively interstate business as a condition of entry into the State" (382 U.S., at p. 2, 86 S.Ct., at p. 34). The dissent also suggests the reliance of the appellee (and presumably of the court majority) on Robertson v. People of State of California, supra, 328 U.S. 440, 66 S.Ct. 1160, which we have shown above to have manifested a liberal and sympathetic view of state efforts at essential regulation of local incidents of interstate business as against criticism for interference with interstate commerce. In sum, we cannot but construe the dismissal in Fairfax Family Fund as strongly suggestive of the validity, in the context of a state statute regulating consumers' loan practices, of New Jersey's exaction from plaintiff of its qualification for a license, as well as of the application to it of the other regulatory provisions in The Secondary Mortgage Loan Act of 1965, insofar as commerce grounds are concerned.
The act is even-handed and non-discriminatory (after excision of section 3) in its application to all domestic and foreign corporations engaging in loan transactions within the statutory scope, as interpreted above. By reasonable construction of the act, necessitated by the due process clause, plaintiff need not give up its general office in Philadelphia but must maintain a branch office in New Jersey and there maintain records of its transactions involving secondary mortgages on New Jersey realty for inspection by the Commissioner. In this and the other regulations of the statute mentioned in the briefs there is no invidious discrimination against plaintiff either as a foreign corporation or as engaging in interstate commerce.
*573 In view of the fact that the cases teach us that each species of business must be appraised separately in the light of its own local regulatory requirements and of the nature of its peculiar interstate ramifications, and having the benefit of the dismissal in Fairfax Family Fund, we need not tarry long in dealing with the other commerce cases cited by plaintiff and amicus curiae. These have to do with altogether different situations. They cite Allgeyer v. State of Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897), which invalidated a Louisiana statute which penalized the entry by domestic corporations into agreements calling for execution out of the state of insurance contracts covering property in the state with companies not in compliance with the insurance laws of the state. First, the fact situation presented there was totally dissimilar from that here. Second, the decision has subsequently been questioned and confined in its application. See Osborne v. Ozlin, supra, 310 U.S., at p. 66, 60 S.Ct. 758, 84 L.Ed. 1074; Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 318-319, 63 S.Ct. 602, 87 L.Ed. 777 (1943); cf. Howell v. Rosecliff Realty Co., Inc., 52 N.J. 313, at 322-323 (1968) (sustaining local taxation of premiums on insurance written out of the state on property situated here).
Plaintiff also relies on a series of cases holding that a state may not require of a foreign corporation its taking steps to qualify to do business there as a condition of its right to sue there (generally, or on a contract made there) if it does no business in that state except of an exclusively interstate nature. See, typically, International Text-Book Co. v. Pigg, supra. But some of the cases in that field have exhibited considerable readiness to find the local requirement valid where there was some semblance of local contacts by the foreign corporation apart from its purely interstate business. See Union Brokerage Co. v. Jensen and Eli Lilly & Co. v. Sav-On-Drugs, both supra. It is apparent that entirely different local policy questions and regulatory problems are posed in the instant case, and that the sanctions imposed *574 also vary markedly from those in the foreign corporation-registration cases cited. Furthermore, there were here local contacts of importance which preceded and survived the loan transaction itself. There was a mortgage recorded in New Jersey on land situate therein and ordinarily enforceable only by legal action there. Payments on the loan were to emanate from a borrower resident in that state, exerting an effect on its economy, and, if excessive, possibly on its public resources. Cf. Howell v. Rosecliff Realty Co., Inc., supra, 52 N.J., at p. 327. And finally, plaintiff's penetration of the New Jersey borrowing market was, in this case, as rendered indisputable by the affidavits, accomplished through the intermediation of a broker operating here. For purposes of the preceding observations, it makes no difference whether or not that broker was, technically, an employee of plaintiff. Cf. Howell v. Rosecliff Realty Co., Inc., supra, at 326, 327.
In any event, as noted above, the dismissal for lack of a substantial federal question in the Fairfax Family Fund case, supra, in the face of the International Text-Book line of decisions just discussed and relied upon in the dissent in Fairfax Family Fund, establishes to our satisfaction that that line of authority does not require a holding here of unconstitutionality on commerce grounds.
In the light of the foregoing discussion, we also find entirely insubstantial the due process argument so far as it rests, as presented, on the circumstance that the loan documents were executed out of the State.

IX. Full Faith and Credit
Finally, plaintiff contends that refusal to apply Pennsylvania law to this transaction would violate the full faith and credit clause of the Constitution. We determined in VI, above, that the Legislature has, by clear implication, decreed that the Secondary Mortgage Loan Act of 1965 should apply to a loan transaction with these incidents whatever its freedom from violation of any law of the state where the papers were signed. But plaintiff says that for the New *575 Jersey Legislature to so ordain violates the full faith and credit clause. We think well settled principles augur a contrary conclusion.
It is clear that the full faith and credit clause does not require a forum state to enforce a contract valid under nonforum law where enforcement would subvert the public policy of the forum state. See Bradford Electrical Light Co., Inc. v. Clapper, 286 U.S. 145, 160, 52 S.Ct. 571, 76 L.Ed. 1026 (1932); Klaxon Company v. Stentor Electric Manufacturing Company, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Alaska Packers Ass'n. v. Industrial Accident Comm., 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935).
In the instant case, giving this transaction the protective umbrella of the Pennsylvania statute would not only offend New Jersey policy in a most sensitive area, but would negate a New Jersey statute embodying that policy in terms read above by this court to control the very transaction involved. In Casteel v. Casteel, 45 N.J. Super. 338 (App Div. 1957), we spoke to the issue as follows:
"Every state is entitled to enforce in its own courts the policy of its own statutes on subjects properly the incidents of its jurisdiction, and the full faith and credit clause of the United States Constitution does not require otherwise unless the conflicting statute or judgment of another state is shown, on some rational basis, to have a superior basis for recognition. Alaska Packers Association v. Industrial Accident Commission, 294 U.S. 532, 547, 548, 55 S.Ct. 518, 79 L.Ed. 1044 (1935)." (at p. 354)
The Pennsylvania statute does not have a claim for recognition to validate this transaction superior to that of the New Jersey statute for subjection of the transaction to its requirements. The freedom of plaintiff ordinarily to contract how and with whom it will does not rationally outweigh the decree of the New Jersey Legislature, born of the baneful background circumstances related above, that whoever, wheresoever resident, would lend to residents of New Jersey on the security of a secondary mortgage on property in that *576 State must comply with the regulatory requisites it has laid down at peril of losing its right of recovery on such a loan in New Jersey courts.
We find the contention grounded on denial of full faith and credit to lack merit.[6]

X. Cancellation of the Mortgage
Pending argument of the appeal, plaintiff, on June 7, 1968, caused the mortgage it took from defendants to be cancelled and discharged of record, and we have granted its motion to add the evidence of that fact to the record. Plaintiff's position is that the discharge of the mortgage relieves the transaction of any coverage by the act. This contention is akin to one of the main grounds on which it prevailed below  that the note and mortgage are separate and distinct and that in an action on the note alone, as here, the taking of the mortgage and any legal incidents thereof are irrelevant to plaintiff's right of recovery thereon.
Both of the stated points miss the policy objective of the act. This was to prevent the taking of secondary mortgages on residences as security for a loan unless preceded and accompanied by compliance with the statutory regulations, and this for reasons sufficiently explained hereinabove. The legislative policy is prophylactic as well as curative. Only by the application of the stringent sanctions set forth in the act did the Legislature conceive that entry into such unauthorized transactions could be adequately deterred. To allow a lender to get by with the exaction of a secondary mortgage as security for a loan violative of the act, and to defeat the application of sanctions, when challenged, by then cancelling the mortgage, would be to defeat the effectiveness of the sanction as a deterrent.

*577 XI. Violations Calling for Sanctions
Section 29 of the act reads:
"No obligation arising out of a secondary mortgage loan shall be enforceable in the courts of this State unless such loan was negotiated and made in full compliance with the provisions of this act."
Defendants' position is that they were entitled to summary judgment under section 29 on the ground of a number of asserted violations of the act, some of which were the subject of factual dispute on the cross-motions for summary judgment and others not.
The asserted violations involving disputed issues of fact were:
(a) fraud and misrepresentation as to any mortgage being involved in the transaction; (b) being compelled to purchase insurance; (c) exaction by plaintiff's agent of an unauthorized brokerage fee through the enforced purchase of a television set.
If the case for plaintiff's violation of the act depended upon any of the foregoing, the matter would have to be remanded for trial of the factual issues. In view of our conclusion as to the effect of some of the undisputed violations, this will be unnecessary.[7]
The asserted undisputed failure to obtain a license; violations of the Act itself are: (a) the plaintiff's; (b) exaction of excessive interest; (c) inclusion in the not of a power of attorney to confess judgment.
Defendants also project violation by plaintiff of the Commissioner's regulation 5(d), requiring the lender to give the borrower notice in writing of his right to independent counsel *578 before signing the papers. There is no dispute that no such notice was given. As to this contention, however, we seriously doubt that a sanction as heavy as preclusion of the right to sue to recover any part of the loan is applicable to violation of a regulation of the Commissioner as distinguished from violation of the act. The pertinent section (29) speaks only in terms of failure of "compliance with the provisions of this act." Elsewhere in the statute, by contrast, there is reference to violation of "this act or any rules or regulations promulgated pursuant thereto." Section 14. See also section 11(c).
Nor could we, in the circumstances here presented, forfeit plaintiff's entire chose in action for failure to have obtained a license. Under section 3 it would have been futile for plaintiff to have applied for a license, as it did not qualify thereunder. To date there has been no reported decision at all, declaring the section invalid. It would be grossly unfair, therefore, to penalize plaintiff by depriving it of its right of action on the note on this ground. However, all "persons" (as defined in the act, section 1 (b)) engaging in transactions covered by the act henceforth are herewith put on notice that the licensing provisions as well as all other valid provisions of the act and regulations are applicable to them.
The remaining undisputed violations of the act  taking of excessive interest and incorporating in the note a power of attorney to confess judgment  will necessarily require the sanction of section 29 to be imposed. The fact that plaintiff did not act on the power of attorney to confess judgment is of no more consequence than its voluntary cancellation of the mortgage, and for the same reasons as stated above in that regard. The note may therefore not be the subject of an action to recover thereon in the courts of this State.
The judgment is reversed and the cause remanded for entry of final judgment in favor of defendants.
NOTES
[1] Reference herein to section numbers of the Act will identify corresponding numbers in N.J.S.A.E.g., section 1 is N.J.S.A. 17:11A-1.
[2] Plaintiff states that the comparable allowable rate under the Pennsylvania act is 17.38%.
[3] The amount of the instant loan complied with the $3,500 limitation since the act provides that that limitation may be exceeded by the amount of interest or other charges authorized by the act. Section 6213, subd. E.
[4] Compare section 22 (c) of the New Jersey act which provides the borrower shall not be "compelled" to purchase fire, life or title insurance.
[5] It of course does not matter that in this particular transaction the loan terms may not have been as egregious as the generality of the practices which led to enactment of the statute. If the act applies, and is valid, it must be given even-handed effect in all cases within its coverage.
[6] Having disposed of the particular constitutional challenges raised herein, we note that the act has also recently been held free from invalidity on grounds of vagueness in various particulars. Crescent Investments Co. v. Commissioner of Banking and Insurance, 103 N.J. Super. 11 (Ch. Div. 1968).
[7] Ground (a) depends on whether the sanction of nonenforcement can be applied to a statutory ground for suspension or revocation of a license under section 11, such as commission of any fraud, engaging in any dishonest activities or misrepresentation, as distinguished from any absolutely prohibited act. We need not decide the question.