614 A.2d 124

INSTRUCTIONAL SYSTEMS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. COMPUTER CURRICULUM CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued May 4, 1992—Decided October 19, 1992.

*Peter N. Perretti, Jr.,* argued the cause for appellant and cross-respondent (*Riker, Danzig, Scherer, Hyland & Perretti* and *Dunn, Pashman, Sponzilli, Swick & Finnerty,* attorneys; *David W. Garland, Jeanne M. Bratsafolis, Robert E. Rochford, Warren S. Robins, Joseph Dunn, Anne M. Patterson,* and *Jeffrey J. Miller,* on the briefs).

*Jay Greenfield,* a member of the New York bar, argued the cause for respondent and cross-appellant (*McCarter and English,* attorneys; *Mr. Greenfield, Andrew T. Berry, Teresa L. Moore, Rosanne C. Kemmet, Debra Ann Livingston,* a member of the New York bar, and *Michael E. Gerber,* a member of the New York bar, of counsel; *Ms. Moore, Ms. Livingston,* and *Mr. Gerber,* on the briefs).

*Michael J. Ferrara* submitted a brief on behalf of *amicus curiae* Fair Franchising Coalition (*Greenberg, Ferrara, Covitz, Turitz, Harraka & Goldberg,* attorneys; *Jere W. Glover,* a member of the District of Columbia bar, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

This appeal requires us to adapt legislation enacted over twenty years ago on the model of franchise stereotypes, such as a fast-food outlet, an automobile dealership, or a gasoline service station, to the rapidly-evolving complexities of the com-

puter industry and its various distribution channels. We hold that the contractual relationship between the producer of a computerized educational-learning system and its exclusive regional distributor, a business incorporated in New Jersey, sustains a finding of a "franchise" within the meaning of the New Jersey Franchise Practices Act, *N.J.S.A.* 56:10–1 to –15 (the Act). The Appellate Division held that the relationship between the producer and the New Jersey entity did not constitute a franchise because the producer had not granted the New Jersey entity a "license to use" its trade name or trademark within the meaning of the Act. *N.J.S.A.* 56:10–3a. However, the contract documents expressly conferred on the New Jersey entity both the right to use the producer's "name, trademark and logo in its advertising, exhibits, trade shows, public relations materials and manuals," and the duty to use its "best efforts" to promote the producer's products. Although our second determination involves a much closer question, we hold that the evidence sustains the finding of a "community of interest" required under the Act to establish a franchise. *N.J.S.A.* 56:10–3a. We thus reverse the judgment of the Appellate Division.

## I—BACKGROUND

### A. *Facts and Procedural History*

For purposes of this appeal, we adopt generally the procedural history and the facts of the case as set forth in the brief of defendant, Computer Curriculum Corporation (CCC).

CCC is a Delaware corporation headquartered in Palo Alto, California. It produces and markets an integrated learning system that uses computer technology to teach and monitor a student's progress in such subjects as mathematics, reading, language skills, and computer-science education. From 1974 to 1989, plaintiff, Instructional Systems, Inc. (ISI), a New Jersey corporation with its primary place of business in New Jersey, has served as the exclusive distributor of products sold by CCC in the Northeast. ISI has done so pursuant to a series of written contracts negotiated between the principals of the two companies.

On July 12, 1984, CCC and ISI entered into the contract at issue, entitled "Reseller Agreement." Under that contract, CCC appointed ISI as the exclusive "reseller" of CCC products to certain categories of customers in Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, and Washington D.C. The contract provided that the agreement "shall * * * continue in effect until July 31, 1989."

In the fall of 1988, ISI proposed that CCC extend the 1984 Reseller Agreement for one more year. CCC declined to do so. CCC believed that ISI was spending a disproportionate amount of its efforts selling in three states—New Jersey, New York, and Massachusetts—and was practically ignoring the rest of its sales territory. From 1985 to 1987, ISI's sales outside those three states accounted for only eleven percent of its total sales, notwithstanding the fact that thirty percent of the student population in ISI's territory resided there. In two states, Vermont and New Hampshire, ISI made no sales during that period. In Maine, ISI made no sales in either 1986 or 1987. In the District of Columbia, one of the principal population centers in ISI's territory, ISI's sales for the 1985–1987 time period were less than one percent of ISI's total revenues.

When CCC approached ISI about its allegedly poor sales performance in those states, ISI claimed that its only obligation was to meet certain territory-wide sale quotas. In CCC's view, ISI had told CCC "that it was none of CCC's business" within which territory ISI concentrated its sale efforts.

Instead of allowing the 1984 Reseller Agreement to lapse when it expired, CCC offered ISI a new two-year contract for the three states in which ISI had its major sales activity—New Jersey, New York, and Massachusetts. CCC decided to take over the marketing of its products in the former ISI territory. Following lengthy discussions, ISI and CCC entered into a new contract on January 30, 1989. On August 1, 1989, CCC began to distribute its products in the former ISI territory. ISI continues to sell CCC products in New Jersey, New York, and Massachusetts.

The same day that ISI executed the new agreement with CCC, ISI filed suit against CCC in the Chancery Division. The complaint alleged that the 1984 Reseller Agreement contemplated renewal, that CCC had coerced ISI into signing the new contract, and that CCC had violated the Act by imposing "unreasonable standards of performance" on ISI. The complaint also set forth claims for breach of contract, breach of implied covenant, tortious interference with prospective economic advantage, unfair competition, unjust enrichment, and breach of fiduciary duty.

CCC removed the suit to the United States District Court for the District of New Jersey on the basis of diversity of citizenship. Following discovery, ISI moved for a preliminary injunction enjoining CCC from enforcing the 1989 agreement and for partial summary judgment on its claims under the Act. CCC made a cross-motion for summary judgment, arguing that if the Act could be used to enjoin it from terminating ISI's purported franchise in states other than New Jersey, the Act would violate the Commerce Clause of the United States Constitution. *U.S. Const.* art. I, § 8, cl. 3.

ISI responded to the cross-motion by moving before the District Court for an order remanding the state-law issues to the New Jersey courts under the *Pullman* abstention doctrine. See *Railroad Comm'n of Texas v. Pullman Co.*, 312 *U.S.* 496, 61 *S.Ct.* 643, 85 *L.Ed.* 971 (1941). The District Court retained jurisdiction over the case and "[a]pplication of the principles of the law determined by the state court to the facts of this case," but "administratively * * * terminated" the matter and remitted to the New Jersey courts the following issues:

(a) [w]hether the Act has extraterritorial reach beyond the State of New Jersey and, if so, to what extent; and

(b) [w]hat are the definitions and standards of "community of interest," "license" and "place of business" under the Act[?]

After ISI protested that the limited scope of the remand instructions was tantamount to directing the state court to render an advisory opinion, the court clarified its order. That order authorized the New Jersey court to determine "whether

or not there is a community of interest between ISI and CCC," and "whether ISI has a place of business" within the meaning of the Act. The District Court acknowledged that the state court would have to consider the facts of the case in deciding those issues and whether the Act could be applied extraterritorially.

When the matter was returned to the Chancery Division, ISI filed a new complaint alleging that the 1984 Reseller Agreement had created a "franchise" and that CCC had violated the Act by failing to renew the agreement without "good cause" and by imposing unreasonable standards of performance. The complaint sought "a declaration of the rights and liabilities of CCC and ISI under their relationship," an order enjoining CCC from terminating its relationship with ISI, damages, attorneys' fees, and costs. Both parties agreed to submit the case to the Chancery Division based on the District Court's record and without further discovery.

The Chancery Division issued a declaratory judgment that the relationship between the parties constituted a "franchise" and that that relationship was subject to the Act.

The Chancery Division ruled first that the importance of New Jersey's interest in protecting its franchisees nullified the 1984 agreement's California choice-of-law provision. Next, the court found there could be "no other reasonable conclusion" but that CCC and ISI had "contemplated" that plaintiff would have a "place of business" in New Jersey as required by the Act for coverage. The court then found that CCC had granted to ISI a license to use its trade name. The court based that finding on the conclusions that the school districts buying CCC products had perceived ISI and CCC to be the same entities, and that CCC had "vouched" for ISI's competence by having ISI train customers to use CCC products.

The court found further that there was unequal bargaining power and sufficient mutual dependence between the parties to form the Act's "community-of-interest" requirement. Finally,

the court found that the Legislature had not sought to give the Act extraterritorial effect beyond New Jersey. Rather, it was the parties, by defining a market area in their contract which includes states beyond the State of New Jersey, who gave the Act the extraterritorial reach.

The Appellate Division reversed, holding that the 1984 agreement does not constitute a franchise within the meaning of the Act because CCC "did not grant a 'license' to ISI as that term is used within the Act's definition of 'franchise.'" *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 243 *N.J.Super.* 53, 58, 578 *A.*2d 876 (1990). The Appellate Division declined to consider whether the Act, if it had been applicable to the relationship between CCC and ISI, could have been applied extraterritorially. *Id.* at 61–62, 578 *A.*2d 876.

We granted ISI's petition for certification, 126 *N.J.* 318, 598 *A.*2d 879 (1991). Because the Appellate Division had based its decision solely on the license issue, we asked the parties to brief the remaining issues of choice of law, place of business, community of interest, and extraterritoriality. We heard reargument on those issues. We now reverse.

### B. *Technical Background and Reseller Agreement*

In order to understand this appeal more fully, we must attempt to understand something about which we know very little—computer technology. A computer is not like a manual typewriter, on which we can actually see the physical connection between input—manually pressing a key, and output—the hammer striking a sheet of paper. One who presses a few keys on a computer keyboard that produces information or text on a video-display screen is largely unaware of what actually occurs within the machine to allow the information to be presented. However, a rudimentary understanding of computer technology helps one to grasp the relationship between CCC and ISI.

There are three basic components involved in the computer process: hardware, operating-system software, and application software. All of those components have distinct responsibilities that must be carried out with precision and in harmony. *See* 11

*McGraw–Hill Encyclopedia of Science & Technology* 124–26 (7th ed. 1992) (*McGraw–Hill*); *Encyclopedia of Computer Science* 641–49 (1976).

Hardware, the most obvious component of the computer process, consists of all of the physical objects that make up a computer; *i.e.*, a central processing unit, or CPU (the part of the computer that contains the electronic circuits), a keyboard, a video display, and a printer. *See generally* Linda G. Christie & John Christie, *The Encyclopedia of Microcomputer Terminology* (1984) (*Microcomputer Terminology*) (defining computer-related terms). Operating-system software interacts directly with the hardware and tells the computer how to perform the most basic functions. For example, without a software-operating system, a computer would not know how to place a character on the video-display screen and would be nothing more than a useless mass of silicon and plastic. Simply stated, operating-system software turns the hardware into a usable machine. *See McGraw–Hill, supra,* at 125–26. The operating-system software often accompanies the computer's major hardware component, the CPU. *See Microcomputer Terminology, supra.*

Application software interacts directly with operating-system software to comprise the final set of instructions required to make a computer perform a given task. Application software ranges from "off-the-shelf" packages, such as familiar word-processing programs like WordPerfect, which may be purchased at the neighborhood-software store, to custom designed, user-specific programs. Application software does not interact with the computer hardware but interacts exclusively with the operating-system software. *See McGraw–Hill, supra,* at 125–26. Therefore, application software is usually designed to interact with one type of operating-system software. *Ibid.* Because of that limitation, the computer industry has developed standard operating-system software packages that run with a great majority of computer hardware. Two of the most notable

standard operating systems are "MS–DOS" and "UNIX." [1] *See Time–Life, supra,* at 96–97.

The CCC computer-assisted learning system consists of hardware, operating-system software, and application software. The CCC system's hardware is the amalgamation of numerous physical components that CCC has assembled together into what it calls the "Microhost." The Microhost's operating-system software, also developed by CCC, is a modification of the UNIX operating system. CCC system's application software is essentially the heart of the CCC product line. CCC has spent over twenty years researching and developing an extensive library of educational-curriculum software, which CCC describes as "Courseware."

The CCC integrated-learning system reinforces what is being taught to the student in the classroom. Visualize a "computer laboratory" of students working at numerous computer terminals. When a student punches into the computer a four-digit identification number followed by the student's first name, the words "Hello, Student * * * " flash on the terminal screen. Each computer session begins where the student finished the previous day. When the student types an incorrect answer, the computer politely suggests "Try again." When the student finishes the lesson, the screen displays the student's results and the computer records the student's performance.

Students use the CCC computer-assisted instruction system to extend their classroom lessons and to enhance learning and

---

[1] MS–DOS is the operating-system software that runs the IBM Personal Computer (or PC) family and was developed by Microsoft Corporation. See Time–Life Books, *Understanding Computers—The Personal Computer* 17 (1985) (*Time–Life*). That operating system, referred to as DOS, MS–DOS, or PC–DOS, has been shipped with every IBM–PC hardware unit since the release of the original PC in 1981.

UNIX is the operating-system software developed by AT & T. UNIX and MS–DOS are very different operating systems. One of the greatest distinctions between the two operating systems is in the development of application software that interacts with the two operating systems. The computer industry has created generally a much greater resource of application software to interact with the MS–DOS operating system. *Id.* at 96–97.

performance. Teachers accompany their classes to the computer laboratory, where they help students understand the problems and relate the instructions from the classroom to the computer laboratory. Teachers need no expertise as computer operators or programmers. The teachers are trained on how the system works and are familiarized with the available software curriculum, or Courseware.

CCC is in large measure the creation of Dr. Patrick Suppes, formerly of Stanford University, who spent over two decades researching and developing the CCC system. Except in the Northeast, CCC markets, distributes, and sells its products directly to educational institutions throughout the United States.[2] Over the past fifteen years, CCC has developed a distribution arrangement in the Northeast with Phyllis Kaminer (Kaminer), the President and CEO of ISI. Evidently, Kaminer developed some expertise in the field of education and computers, and, in 1972, became associated with a company known as Educomp of Connecticut. In her position at Educomp of Connecticut, Kaminer developed a relationship with CCC. Following Educomp of Connecticut's refusal to make an arrangement with CCC for the promotion of CCC products, Kaminer left Educomp of Connecticut and sought her own arrangement with CCC.

CCC entered its first distribution contract with Kaminer in 1975. At that time, Kaminer was the principal of a company known as Educomp of New Jersey, located in Tenafly, New Jersey. The 1975 agreement gave Educomp of New Jersey the exclusive right to market CCC products in the states of New York, New Jersey and Connecticut and in the region of Eastern

---

[2] At one point, CCC distributed its products in the South through a company known as Southern Educational Media; however, CCC terminated that business relationship in the mid–1980s and currently acts as the distributor of its products in the South. In Canada, CCC distributes its products through a company known as Columbia Institute of Canada.

Pennsylvania.[3] The 1975 agreement was to run until 1980.

The record suggests that sometime between 1975 and 1980, Kaminer changed the name of her company to ISI and moved the headquarters to Englewood Cliffs, New Jersey. In 1980, CCC entered into a new distribution agreement with ISI. The 1980 agreement gave ISI the "exclusive right to purchase or license the CCC products * * * for purposes of selling, leasing or renting such products to the market in the States of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont and Washington D.C." The 1980 agreement was to run until 1984.

The 1984 agreement between CCC and ISI, labeled "ReSeller Agreement," contained many of the same provisions as the 1980 agreement. ISI highlights several provisions contained in the 1984 agreement that it deems relevant:

1. CCC conferred on ISI an exclusive right to sell and license CCC's products within ISI's territory.

2. CCC required ISI to use "its best efforts to develop a demand for and Resell the [CCC] Products within the Market * * *."

3. CCC obligated ISI to "devote all of its energies and resources to developing a demand for the [CCC] Products."

4. CCC prohibited ISI from selling any products competitive with CCC's products.

5. CCC required ISI to maintain at least four full-time sales representatives to promote and sell CCC's products.

6. CCC obligated ISI to "maintain adequate facilities * * * to promote demand for and Resell [CCC's] Products."

7. CCC required ISI to promote CCC's products through "advertising and exhibition at trade shows, conventions and the like."

8. CCC authorized ISI to extend its use of the CCC name, trademark and logo in ISI's "advertising * * * public relations materials and manuals."

9. CCC gave ISI the right to sublicense the CCC copyrighted Courseware.

---

[3] The original language of the 1975 agreement stipulated that CCC was entering into a contract with "Educomp Corporation, a Connecticut Corporation, with its principal place of business at 196 Trumball Street, Hartford Connecticut." However, after Kaminer had received the document, she had the language changed to read "Educomp of New Jersey Inc., a New Jersey Corporation," and the address in Connecticut was stricken and replaced by an Englewood Cliffs, New Jersey address.

10. CCC allowed ISI to receive sublicense fees from its customers for the CCC Courseware and to pay CCC license fees for each sublicense in accordance with a price schedule established by CCC.

11. CCC required ISI to prepare customers' sites for installations of the CCC product in accordance with CCC specifications; CCC installed the products.

12. CCC required ISI to "establish and maintain a program for the benefit" of the users of the CCC products so that they may obtain training in the use and operation of the CCC products.

13. The agreement was to be interpreted in accordance with the laws of the State of California.

In ISI's view, under the terms of the 1984 agreement, it had the responsibility of locating customers, persuading them to purchase CCC's products, selecting the site at which the product was to be installed, and placing the purchase orders with CCC. Following CCC's installation of the product, ISI would train the teachers and instructors to use the product. Thereafter, ISI had a duty to follow-up with the customer to provide continuing training at those locations. Ninety-seven percent of ISI's revenue came from the sale of CCC's products.

In 1988, in an effort to remain competitive within the computer-assisted-instruction industry and to avoid product obsolescence, CCC decided to change the direction of its business. Around that time, CCC began negotiations with IBM to allow its application software, or Courseware, to run on the MS–DOS standard operating system. By allowing its Courseware to run on MS–DOS, CCC would increase the accessibility of its product line. Thus, such an arrangement would allow CCC's Courseware to run on the popular IBM Personal Computer family, thereby eliminating CCC's need to assemble and market its own Microhost hardware. Presumably, such an arrangement would allow CCC to market its products more competitively to smaller school districts because the smaller districts would not be "locked-in" to purchasing the CCC Microhost, and could purchase a less expensive and more versatile IBM–PC instead.

CCC's efforts to change business directions caused CCC to reconsider its relationship with ISI. In 1989, CCC offered to ISI a new written agreement (the 1989 agreement) that modified the 1984 Reseller Agreement. That agreement reduced ISI's marketing territory to three states: New Jersey, New

York, and Massachusetts. The balance of ISI's prior territory comprising Maine, New Hampshire, Vermont, Rhode Island, Connecticut, Delaware, Maryland, and the District of Columbia was taken over by CCC and has been marketed directly by CCC since August 1, 1989. The 1989 agreement eliminated ISI's exclusive right to sublicense the CCC Courseware in the assigned territory.

## II

What is a "franchise" under the New Jersey Franchise Practices Act?

We now turn to the issue of whether the business relationship between CCC and ISI constitutes a franchise protected under the Act. CCC asserts that the 1984 agreement does not constitute a franchise because (1) CCC never granted to ISI a "license," as that term is contemplated under *N.J.S.A.* 56:10–3a; (2) there is no "community of interest" between CCC and ISI; (3) the parties did not "contemplate" that ISI would maintain a "place of business" within the State of New Jersey; and (4) ISI never maintained a "place of business" in the State of New Jersey. We address each of those arguments in turn.

Although franchise arrangements take many different forms, "in its simplest form, franchising involves a company with a product or service which arranges for a group of dealers to handle its distribution. The company with the product, product line or service is known as the franchisor, and the dealers who acquire the right to sell the product or service exclusively are known as franchisees."

> [Ernest Gellhorn, *Limitations on Contract Termination Rights—Franchise Cancellations*, 1967 *Duke L.J.* 465, 465 n. 1 (quoting Lewis & Hancock, *The Franchise System of Distribution* 1 (1963) (Gellhorn)).]

There are three general categories of business franchises:
(1) *Product Franchises*, under which a "franchisee[ ] distribute[s] goods produced by the franchisor * * * and which bear the franchisor's trademark. * * * Typical product franchises include automobile and truck dealers, gasoline service stations, and soft drink bottlers."
(2) *Package or Format Franchises*, under which "the franchisee is licensed to do business under a prepackaged business format established by the franchisor and identified with the franchisor's trademark. * * * Examples of format franchises include fast food outlets and automotive products or services."
(3) *Fractional Franchises*, under which "franchisees market a manufacturer's or supplier's trademarked products. In contrast to product or format franchises, the fractional franchisor exerts minimal control over the franchisee's business operations, and the franchisee often operates under [its] own trade name.

Common fractional franchises include independent hardware stores * * * that sell a variety of products [belonging to different manufacturers]."

[Kevin S. Dittmar, *Foerster, Inc. v. Atlas Metal Parts—The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law*, 1985 *Wis.L.Rev.* 155, 167–68 (footnotes omitted) (Dittmar).]

At common law, freedom of contract was the rule applicable to franchise agreements. Gellhorn, *supra*, 1967 *Duke L.J.* at 468. "The effects of termination were starkly simple—the franchisee would be ousted from the franchise, essentially forfeiting his investment * * *. The franchisor would then regain full control of the terminated business and would be free to begin a relationship with a new franchisee." *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 100 *N.J.* 166, 176, 495 *A.*2d 66 (1985) (citations omitted); *see also* Gellhorn, *supra*, 1967 *Duke L.J.* at 467 n. 5 (describing the financial hardship suffered by a terminated beer distributor).

Recognizing that the marketplace was not necessarily the best protector of those franchisees with substantially-inferior bargaining power, this Court wrote:

Where there is grossly disproportionate bargaining power, the principle of freedom to contract is non-existent and unilateral terms result. In such a situation courts will not hesitate to declare void as against public policy grossly unfair contractual provisions which clearly tend to the injury of the public in some way.

[*Shell Oil Co. v. Marinello*, 63 *N.J.* 402, 408, 307 *A.*2d 598 (1973), *cert. denied*, 415 *U.S.* 920, 94 *S.Ct.* 1421, 39 *L.Ed.*2d 475 (1974) (citing *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 403–04, 161 *A.*2d 69 (1960)).]

Franchising became a popular method of distribution in the late 1960s. 1 Gladys Glickman, *Franchising* § 2.01 at 2–3 (1969) (Glickman). As the popularity of franchising grew, concerns were raised about the degree of control the franchisor exercised over the franchisee, in particular, the franchisor's power of "life or death" to terminate the franchise. *Id.* at 2–3 to 2–4.

In response to the growth of national franchising, the Federal Trade Commission (or FTC) began setting guidelines for franchises in the 1970s. *Id.* § 2.02[2] at 2–7 to 2–8. The FTC defines a "franchise" as "any continuing commercial relation-

ship * * * whereby * * * a person (hereinafter 'franchisee') offers, sells, or distributes * * * goods, commodities, or services which are: (1)[i]dentified by a trademark, service mark, trade name, advertising or other commercial symbol designating another person (hereinafter 'franchisor')." 16 *C.F.R.* § 436.2(a) (1992). The FTC definition requires further that the "franchisor exert[ ] or [have] authority to exert a significant degree of control over the franchisee's method of operation." *Ibid.*[4] In the "Guides to Compliance" accompanying the FTC franchising rule, the Commission states:

"The name which the parties give to their relationship is not relevant in determining whether the relationship is within the scope of the rule. Thus, a relationship described by the parties as a "franchise" will not be covered by the rule unless it meets the definitional criteria of the rule; conversely, a self-described 'distributorship' will be covered by the rule if the definitional elements are satisfied."

[Glickman, *Franchising, supra,* § 2.02[2] at 2–8 n. 7 (quoting *Final Guides to Compliance with Franchising Rule* § IA, 44 *Fed.Reg.* No. 166, p. 49966).]

Therefore, in determining whether a relationship constitutes a franchise, the FTC examines the entire course of dealings between the parties.

Prompted in large measure by the unfair practices of automobile manufacturers and major oil companies, New Jersey passed the Franchise Practices Act in 1971. *N.J.S.A.* 56:10–1 to –12. This Act was supplemented in 1977 with four sections, two of which specifically concern automobile franchises. See *N.J.S.A.* 56:10–7.1 and 56:10–13. In 1982, the Legislature passed the Motor Vehicle Franchises Act, *N.J.S.A.* 56:10–16 to –25 (now *N.J.S.A.* 56:10–16 to –29). The Franchise Practices Act (the Act) provides franchisees protection against indiscriminate terminations by prohibiting cancellation or non-renewal of franchises for other than good cause. The Act's supporters indicated that "[t]his bill gives neither the franchisor nor franchisee the upper hand. What it does, however, is to prevent arbitrary

---

4 H.R. 5233, the "Federal Fair Franchise Practices Act," has recently been introduced in Congress. The bill would adopt a more expansive definition of a franchise than under the present FTC definition. *See* Kim A. Goodhard, *Franchise Bills Would Have Broad Impact, Nat'l L.J.,* Aug. 3, 1992, at 21, 23.

or capricious actions by the franchisor who generally has vastly greater economic power than the franchisee." Franchise Practices Act: *Hearing on A. 2063 Before the Assembly Judiciary Comm.*, 194th Leg., 2d Sess. 136 (1971) (*Hearing on A. 2063*) (Statement of Charles W. Davis, Executive Vice–President New Jersey Hotel/Motel Ass'n).

The Act defines a franchise as

a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

[*N.J.S.A.* 56:10–3a.]

However, not all franchisees are protected; the Act

applies only to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise.

[*N.J.S.A.* 56:10–4.]

III

Does the New Jersey Franchise Practices Act apply at all in view of the parties having chosen California law to govern the interpretation of their contract?

The threshold question is whether New Jersey law should govern this dispute. The 1984 Reseller Agreement contains a provision stipulating that the "[A]greement shall be construed and interpreted, and the legal relations created by it shall be determined, in accordance with the laws of the State of California." Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy. *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 208 *N.J.Super.* 666, 671–72, 506 *A.*2d 817 (App.Div.1986); *Kalman Floor Co. v. Jos. L. Muscarelle, Inc.*, 196 *N.J.Super.* 16, 21–22, 481 *A.*2d 553 (App.Div.1984), *aff'd*

*o.b.*, 98 *N.J.* 266, 486 *A.*2d 334 (1985). That view is reflected in the *Restatement (Second) of Conflicts of Laws* § 187 (1969) (*Restatement*), which provides that the law of the state chosen by the parties will apply, unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties.

The exception set forth in part (a) of the *Restatement* approach does not apply because CCC is headquartered in California, and hence California law has a "substantial relationship to the parties." CCC argues that the exception under part (b) of the *Restatement* does not apply because New Jersey does not have a "materially greater interest" than California concerning ISI's distribution rights in states *other than New Jersey*. CCC argues that New Jersey has an interest in regulating only those franchise terminations that occur within its borders, but that when, as here, the alleged franchise is being terminated in states other than New Jersey, New Jersey has no interest in applying its law protecting the rights of franchisees.

CCC relies on *Carlos v. Philips Business Systems, Inc.*, 556 *F.Supp.* 769 (E.D.N.Y.), *aff'd*, 742 *F.*2d 1432 (2d Cir.1983). In *Carlos*, a manufacturer of dictating equipment had failed to renew an exclusive-distributorship agreement with the plaintiff, who did business in New Jersey, Connecticut, and Ohio. The court found that the only states that had a "true interest" in the outcome of the litigation were those states in which the distributorship was being terminated because "they would be the states which would bear any economic burdens associated with business failures occurring within their borders." *Id.* at 774 n. 4. The court thus applied New Jersey law to determine whether the termination was valid in New Jersey, and Connecticut law to determine if the termination was valid in Connecticut. *Id.* at 774–77. The court declined to apply the franchise-

protection acts of either New Jersey or Connecticut to the non-renewal in Ohio, which had no franchise protection act, stating:

> The court has not been cited to, nor can it find[,] any authority for the proposition that the New Jersey and Connecticut Legislatures purported to give this important legislation extraterritorial effect. Therefore, it declines to so apply them.

[*Id.* at 777.]

CCC argues that because the issue here is the discontinuation of ISI's distributorship in Maine, New Hampshire, Vermont, Rhode Island, Connecticut, Maryland, Delaware, and the District of Columbia, New Jersey does not have an interest in this litigation, let alone one that is "materially greater" than California's or the states whose interests are affected.

Although a close question, we do not believe that the trial court erred in applying New Jersey law to the dispute between the parties. In *Winer Motors, supra,* 208 *N.J.Super.* at 671–73, 506 *A.*2d 817, the court recognized that the state in which the franchisee is located has a significant policy interest in governing the relations between the parties, and determined that the law of that state would apply rather than the law of the contractually-agreed-on forum. There, the franchisee was located in Connecticut and the contract specified that New Jersey law would apply to disputes between the parties. The court declined to apply New Jersey law and determined that just as New Jersey would apply its local law to govern the relationship between an out-of-state franchisor and a New Jersey franchisee, Connecticut would apply its law to govern the relations between an out-of-state franchisor and a Connecticut franchisee. *Id.* at 672–73, 506 *A.*2d 817.

In *Wright–Moore Corp. v. Ricoh Corp.,* 908 *F.*2d 128 (7th Cir.1990), the court refused to apply a contractual clause that selected New York law as the governing law, when the franchisor was located in New York and the franchisee in Indiana. The court applied Indiana law, reasoning that "a franchisor, through its superior bargaining power, should not be permitted to force the franchisee to waive the legislatively provided protections, whether directly through waiver provisions or indi-

rectly through choice of law." *Id.* at 132. The *Ricoh* case, like our case, involved a multi-state (indeed, national) franchise. Nonetheless, subject to Commerce Clause considerations to be discussed in Part VI, *infra* at 366–372, 614 A.2d at 146–148, the *Ricoh* court held that Indiana law governed the franchise relationship. Although New Jersey law contains no express provision against waiver of the Act's protection, that the Act's protection may not be waived appears to be a common assumption. *See Unif. Franchise and Business Opportunities Act* § 103, 7A *U.L.A.* 104 (Supp.1992) (Uniform Act) ("A party to a franchise or business opportunity may not waive a right or benefit conferred, or avoid a duty imposed, by this [Act] * * * .").[5]

That a franchisee's principal place of business in a given state will afford the franchisee the protection of that state's law in connection with all products sold by the franchisee is implicit in other decisions as well. See *Swan Sales Corp. v. Jos. Schlitz Brewing,* 126 *Wis.*2d 16, 374 *N.W.*2d 640, 644 (Ct.App.1985) (because dealer did not do any business in Wisconsin, that state's franchise act could not be applied to Swan's overseas beer sales). Despite some contrary precedent, "[m]ost courts * * * have held that the parties to a franchise agreement cannot avoid the franchise law of the state in which the franchisee is located by providing in their agreement that the laws of another state will govern." Thomas M. Pitegoff, *Choice of Law in Franchise Agreements,* 9 *Franchise Law Journal* 15, 19 (1989).

CCC contends that New Jersey does not have an interest in this litigation because no franchise is being terminated in New Jersey. CCC attempts to split the contract into sales that occur in New Jersey and sales that occur in other states. However, the purpose behind franchise-act legislation is that dealers

---

[5] The Uniform Act was approved in 1987 by the National Conference of Commissioners on Uniform State Laws (NCCUSL). The NCCUSL thought that legislators drafting franchising laws would benefit from the guidance of a uniform act in the field in part because of the interstate nature of the franchise business. Uniform Act, *supra,* 7A *U.L.A.* at 105.

geographically "situated" in a forum state are to be the "desired beneficiaries of the legislation in order to make their bargaining position more equal to manufacturers[']." *Bimel–Walroth Co. v. Raytheon Co.*, 796 *F*.2d 840, 843 (6th Cir.1986). To strip away the spokes of a "hub-type" franchise would counter the purpose of such legislation.

To use a mundane example, assume that an automobile manufacturer gave a franchise to a dealer in Montvale, New Jersey to serve northern Bergen County, New Jersey as well as Rockland County, New York. Would we assume that the New Jersey Legislature would be indifferent to the dealer's plight if, after having made a substantial investment in the fixed plant and having created a market for the manufacturer's vehicle in Rockland County, the manufacturer, without good cause, took over the Rockland County market for itself? ISI's situation is not identical but is analogous. "Few franchises are intrastate," and were parties free to dispense with the protection afforded by franchise acts, any "large franchisor by insertion of a choice of law provision requiring the application of the franchisor's home state's law, could with a stroke of a pen remove the beneficial effect of the franchisee's state's remedial legislation." *Winer Motors, supra,* 208 *N.J.Super.* at 671–72, 506 *A*.2d 817. "We will reject even the parties' choice of New Jersey local law in order to preserve the fundamental public policy of the franchisee's home state where its statutes afford greater protection." *Id.* at 672, 506 *A*.2d 817; *see also Business Incentives Co. v. Sony Corp. of Am.*, 397 *F.Supp.* 63, 67 (S.D.N.Y.1975) (declining to apply a contractual provision that New York law would govern the dispute between New Jersey distributor and New York company that provided Sony products for distribution by the New Jersey company).

As the New Jersey Act and the cases interpreting it make clear, New Jersey has a strong policy in favor of protecting its franchisees. In this case, New Jersey has significant "contacts" with the transaction. The franchisee is located here and the majority of ISI's employees reside in New Jersey. The franchise-specific investments, referred to below, relate primar-

ily to the assets in New Jersey and the goodwill developed for CCC by New Jersey residents. New Jersey would undoubtedly be the state of applicable law had no choice-of-law provision existed.

The Chancery Division reasoned that because ISI maintained a "place of business" in New Jersey and had met all other requirements of the Act, New Jersey had the overriding interest in the fair treatment of its franchisee. The court qualified its interpretation of New Jersey law to the extent that it actually conflicted with the law of sister-states. The record is sufficient to allow New Jersey law to apply.

## IV

What is the appropriate standard of review?

Having determined that New Jersey law governs this dispute, we now address the scope of our review on the issues relating to the existence of a franchise. Although the parties have not briefed the issue before us, we note that in CCC's brief to the United States District Court, CCC posed the question thus: "Summary judgment for CCC is mandated if a reasonable juror could not find that ISI has a franchise subject to the Act." *See New Jersey Am., Inc. v. Allied Corp.*, 875 *F.*2d 58 (3d Cir.1989) (affirming summary judgment); *George R. Darche Assocs. v. Beatrice Foods Co.*, 538 *F.Supp.* 429 (D.N.J. 1981) (granting summary judgment), *aff'd*, 676 *F.*2d 685 (3d Cir.1982); *see also Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 *F.*2d 1131, 1137 (3d Cir.1991) (declaring whether relationship constitutes a franchise is a mixed question of fact and law).

Granted, there are cases that have held that the existence of a franchise is a question of law to be decided by a court. *See Kania v. Airborne Freight Corp.*, 99 *Wis.*2d 746, 300 *N.W.*2d 63, 70 (1981) ("[I]n the absence of a claim of ambiguity, which might require extrinsic evidence, the construction of a written contract is only a question of law for the court."). However, we conclude that that proposition applies

only when the entire relationship between the parties may be deduced from their written arrangements. *See Kinn v. Coast Catamaran Corp.,* 582 *F.Supp.* 682, 686 (E.D.Wis.1984) (finding that written dealership agreement clearly and unambiguously conferred a non-exclusive distributorship); *see also Nebraska Im–Pruv–All, Inc. v. Sass,* 197 *Neb.* 261, 247 *N.W.*2d 924, 926 (1976) (stating that in absence of sufficient factual issues, interpretation of contract to determine existence of franchise is matter of law).

Here, the existence of the franchise is so closely related to the dispositive factual findings of "place of business," "license," and "community of interest" that we believe the appropriate standard is whether the evidence presented was sufficient to permit a factfinder to determine that the statutory requirements for the existence of a franchise were met. Although this case was decided on cross-motions for summary judgment, it arises before the Court as if from a plenary trial because the parties agreed that no further evidence would be presented to the Chancery Division.

## V

Does the business relationship between CCC and ISI constitute a franchise protected under the New Jersey Franchise Practices Act?

### A.

Did the 1984 Reseller Agreement contemplate that ISI would maintain a place of business in New Jersey?

CCC argues that its relationship with ISI is not governed by the Act because ISI does not maintain a "place of business" in New Jersey as that term is contemplated by the Act. CCC argues that in order to satisfy the "place-of-business" requirement, the 1984 Reseller Agreement must have required ISI to conduct its business in New Jersey. CCC further contends that ISI had not established a place of business in New Jersey because ISI could have conducted its business at any location within its territory.

The Act applies only to a franchise "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." *N.J.S.A.* 56:10–4(1). According to the statute, "place of business" means

a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle.

[*N.J.S.A.* 56:10–3(f).]

■ Thus, the statutory terms permit a franchisee to receive the Act's protection if performance of the franchisee's activities *either* contemplates *or* requires a New Jersey place of business. *N.J.S.A.* 56:10–4(1). Hence, a franchise would be governed by the Act whether the contract required a place of business in New Jersey or whether the parties reasonably anticipated that the franchisee would establish a New Jersey place of business. Therefore, the statutory condition is met if the parties "consider[ed] * * * a fixed business location for the sale of the franchisor's products." *SnyderGeneral, supra,* 944 *F.*2d at 1145.

■ There was sufficient evidence to support a finding of fact that the 1984 Reseller Agreement "contemplated" that ISI would have a "fixed business location" in New Jersey. Since 1977, ISI has had a marketing facility in New Jersey. From 1977 to 1986, the marketing facility was located in Englewood Cliffs, New Jersey. ISI moved its operations to Hackensack, New Jersey in 1986. ISI specifically constructed its Hackensack facility so that CCC products could be displayed and demonstrated to prospective customers. To assist in those demonstrations, ISI purchased and installed CCC Microhost computer hardware. Over the years, ISI had used its marketing facilities to conduct hundreds of CCC product demonstrations for education professionals from all over the country. Besides conducting demonstrations, ISI also allows remote cus-

tomers to "rent" its Microhost computers via a telephone-line connection from Hackensack to the remote customer site.

For a franchisee to have a "place of business," the statute requires that the franchisee "display[ ] for sale and sell[ ] the franchisor's goods or offer[ ] for sale and sell[ ] the franchisor's services." *N.J.S.A.* 56:10–3(f). The statute provides further that "an office, a warehouse, a place of storage, a residence or a vehicle" do not qualify as a "place of business." *Ibid.* The latter is the more significant aspect of the "place of business" requirement because it ensures that only those businesses that operate as genuine franchises will obtain the protection of the Act. " 'This [requirement] * * * means there must be a sales location in New Jersey. Mere distribution through an office or warehouse would not qualify.' " *Greco Steam Cleaning, Inc. v. Associated Dry Goods Corp.*, 257 *N.J.Super.* 594, 598, 608 *A.*2d 1010 (Law Div.1992) (quoting William J. Sweeny, *Applying Franchise Act to Terminated Distributors*, 125 *N.J.L.J.* 680 (1990)).

CCC argues that ISI does not satisfy the "place of business" requirement because it merely maintains an "office" in New Jersey, which is specifically excluded by the terms of *N.J.S.A.* 56:10–3(f). Relying on *Darche, supra,* 538 *F.Supp.* 429, CCC asserts that a New Jersey sales office is not a "place of business," even when used to supervise sales calls made throughout a multi-state territory. In *Darche,* the plaintiff was an independent contractor serving as a representative for the defendant food manufacturer. The plaintiff had a ten-state territory, but only one "New Jersey office location from which it supervised its own employees as they rode circuit through its territory soliciting orders." *Id.* at 431. The court held as a matter of law that the New Jersey sales office was not a "place of business," and therefore granted the defendant summary judgment. *Id.* at 434.

According to CCC, the "place of business" requirement means a specified location from which the franchisee, by promi-

nently displaying the franchisor's goods as if they were its own, creates the public perception that it is not merely a seller of the franchisor's goods but is in fact part of a closer, "special relationship"—one unified organization. *See Finlay & Assocs. v. Borg–Warner Corp.*, 146 *N.J.Super.* 210, 219, 369 *A.*2d 541 (Law Div.1976) (discussing special relationship between the parties as it relates to licensing), *aff'd on other grounds*, 155 *N.J.Super.* 331, 382 *A.*2d 933 (App.Div.), *certif. denied*, 77 *N.J.* 467, 391 *A.*2d 483 (1978). CCC would limit the "places of business" that are protected under the Act to the familiar franchise prototypes—the McDonald's restaurants, the Midas Muffler shops, the Buick dealerships, and comparable showrooms or retail outlets.

That ISI is not the same type of establishment as a prototypical franchise is undisputed. Unlike the franchise prototype, the consumer of CCC's products is not the general patron who walks in off the street as if to buy a car or hamburger. Thus, ISI has no free-standing highway facility that is dedicated exclusively to displaying CCC's goods. Instead, ISI has only *one* facility—its headquarters office located on the sixth floor of a commercial office building in Hackensack. From that office ISI manages its entire operation.

CCC argues that such an office does not constitute a "place of business." But there is more to the New Jersey Franchise Practices Act than the prototypes of hamburger stands. *See Morgan v. Air Brook Limousine, Inc.*, 211 *N.J.Super.* 84, 510 *A.*2d 1197 (Law Div.1986). (Although that case involved the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –48, it presupposed that a limousine service company could constitute a franchise albeit there was no specific discussion of the "place of business" requirement.)

The ISI Hackensack facility is much more than a mere sales office or warehouse. That location is a 6,000 square foot facility (about the size of three conventional courtrooms). One can demonstrate a computer-software system only by installing

it and using it. ISI's Hackensack facility is equipped with a demonstration room modeled to simulate the classroom "laboratory." There, customers may experience the feeling of how the system would function in an actual school-room setting. ISI has been giving more than one hundred demonstrations a year at its Hackensack facility. Although some ISI customers have visited installation sites and have received demonstrations outside of New Jersey, that fact does not detract from the reality that the Hackensack facility is more than just an office.

In short, the record sustains the trial court's finding that ISI set up a marketing facility in Hackensack where its customers, education professionals, can inspect the CCC computer system and receive a sales demonstration of the operation of its complex product. ISI's Hackensack facility thus could be found to constitute a "place of business" under the Act.

### B.

Does the record support the trial court's finding that ISI has been granted a "license"?

Before a party may be deemed a franchisee subject to the Act's protections, it must show that it had been granted "a license to use a trade name, trade mark, service mark, or related characteristic[ ]." *N.J.S.A.* 56:10-3a. Arguably, the statutory language "license to use a * * * trade mark" is broad enough to include the act of a trademark owner granting restricted permission to use its name in the grantee's advertising. Without that permission the grantee would be infringing on the grantor's right in the trademark. Indeed, legislators were not moved to limit the statute's wording despite the warning of an opponent of the bill who stated that the definition "is all-inclusive, and would embrace every business arrangement where a trademark or trade name is used." *Hearing on A. 2063, supra,* at 3 (testimony of Peter Dorn, Secretary of the New Jersey State Chamber of Commerce).

But it is obvious that not every grant of permission to use a trademark in the sale of goods or services is a "license" within the meaning of the Franchise Act. For example, a department store that sells brand-name clothing or television sets cannot realistically market those products without using the distinctive name and trademark of the manufacturer.

Setting aside the "community-of-interest" requirement, even if fifty percent of the department store's total revenue were derived from the sale of a particular brand of product, that circumstance would not render the arrangement a "license" within the meaning of the Act simply because the distributor is permitted to use the manufacturer's name to market the products. To define a "license" otherwise might convert every distributorship into a franchise. As the Third Circuit said in *Colt Industries, Inc. v. Fidelco Pump & Compressor Corp.*, 844 *F.*2d 117, 120 (1988), "if this limited agreement constitutes a license to use a trademark, then any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license."

■ The Act's "license to use" requirement does not encompass a definition of "license" in the word's broadest sense, that is: "Permission to do something [that] without the license would not be allowable." *Black's Law Dictionary* 829 (5th ed. 1979) (citing *Great Atl. & Pac. Tea Co. v. City of Lexington*, 256 *Ky.* 595, 76 *S.W.*2d 894, 896 (Ct.App.1934)). Instead, the term "license" as used in the context of the Act constitutes a more narrowly-defined type of entitlement. In the language of *Finlay, supra,* the term "license" means "to use as if it is one's own. It implies a proprietary interest * * *." 146 *N.J.Super.* at 219, 369 *A.*2d 541. At a minimum, the term "license" means that the alleged franchisee must use the name of the franchisor "in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the * * * licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee." *Neptune T.V. & Appli-*

*ance Serv., Inc. v. Litton Sys., Inc.*, 190 *N.J.Super.* 153, 160, 462 *A.*2d 595 (App.Div.1983).

In *Finlay, supra,* no license was found because the distributor had not conducted business under the manufacturer's name. 146 *N.J.Super.* at 220, 369 *A.*2d 541. So too in *Colt Industries, supra,* no license was found because plaintiff had been prohibited from using the defendant's name as part of its own. 844 *F.*2d at 120. In *Neptune T.V., supra,* the court found the presence of a license, but only because the plaintiff had held itself out as an "authorized Litton service source." 190 *N.J.Super.* at 156–57, 462 *A.*2d 595.

CCC contends that it did not grant ISI a "license" as that term is used in the Act. In response, ISI points to section 6.02 of the 1984 Reseller Agreement as expressly authorizing use of the trademark:

> ISI shall use its best efforts to maintain and promote CCC's name, trademark and logo on the Products. ISI is authorized, so long as this Agreement is in effect * * * to use CCC's name, trademark and logo in its advertising, exhibits, trade shows, public relations materials and manuals as the same relate to the Products.

CCC replies that the rights granted under section 6.02 are so limited that the relationship does not satisfy even the broadest definition of license.

That ISI does not use CCC's name as its own is true. ISI has always operated under its own trade name, and admits that it does not use CCC's name on its stationery, business cards, or on any business signs. However, as in *Neptune T.V.,* ISI has established a relationship with CCC that is quite different from that of a department store that sells Apple or IBM computers. Section 6.02 of the 1984 Reseller Agreement *required* ISI to "*use its best efforts* to maintain and *promote* CCC's name, trademark and logo on the Products" (emphasis added). The CCC computerized-educational-learning system is not an "off-the-shelf" product that can be purchased at the neighborhood-appliance store. Rather, it is a unique combination of hardware and software whose identity is integrally related with that of

ISI. Significantly, the 1984 Reseller Agreement prohibited ISI from selling *any products* competitive with CCC products. Moreover, CCC prohibited ISI from developing or designing any products that might compete with CCC's products. Furthermore, CCC obligated ISI to educate and train users of CCC products on a continuing basis. Surely, a factfinder could find the presence of the *Neptune T.V.* criteria here. To repeat the requirements of *Neptune T.V., supra:*

> [A] hallmark of the franchise relationship is the use of another's trade name in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee in respect of the subject of trade name. See *Susser v. Carvel Corporation*, 206 *F.Supp.* 636, 640 (S.D.N.Y.1962), aff'd 332 *F.*2d 505 (2d Cir.1964), app. dism. 381 *U.S.* 125, 85 *S.Ct.* 1364, 14 *L.Ed.*2d 284 (1965) in which the court explained that
>> * * * the cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product.

.[190 *N.J.Super.* at 160, 462 *A.*2d 595.]

To transpose the words of *Neptune T.V.*, "We are satisfied that this hallmark was present here since by [CCC's] designation of [ISI] as an [exclusive distributor] and its [requirement]" that ISI maintain and promote CCC's name, trademark, and logo, CCC "gave its imprimatur to [ISI's] business enterprise in respect of [CCC's] product and induced the consuming public to expect from [ISI] a uniformly acceptable and quality controlled service endorsed by [CCC] itself." 190 *N.J.Super.* at 160–61, 462 *A.*2d 595.

Our dissenting members view the *Neptune T.V.* standard as insufficient to create a franchise relationship; they would insist that the identities of the two be merged; they look for an *alter-ego* relationship on the model of the franchise stereotypes—the McDonald's restaurants. That standard would require that such a business operate under the manufacturer's name before it fits the franchise definition. However, the inclusion of independently-named businesses is implicit in the Act's defini-

tion of franchise by the Act's limitation to a franchise "where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise." *N.J.S.A.* 56:10–4(3). Therefore, if only a "mirror-image" relationship could constitute a franchise, the Legislature would have added a superfluous requirement in the Act that the franchise sales constitute twenty percent of the entire business. The addition of that language, "more than 20%" of gross sales, seems to contemplate the creation of the "fractional franchise" described in Part II, *supra* at 338, 614 *A.*2d at 131, under which the franchisee operates under its own unique trade name.

Even were we to seek an *alter-ego* standard for the franchise-license requirement, the record is replete with evidence that such a merger of identity actually existed. ISI's reputation throughout the Northeast has always been exclusively as a CCC distributor. If a customer in the Northeast wanted CCC products, it could find them only through ISI. CCC explicitly promoted ISI as its exclusive distributor. Training of customers on CCC products occurred through ISI. Any purchaser could have reasonably perceived that a "special relationship," *Finlay, supra,* 146 *N.J.Super.* at 219, 369 *A.*2d 541, existed between ISI and CCC. Indeed, one member of the educational community, Brother William L. Lambert, remarked, "Although ISI appears to be a separate company from CCC, I and the educational community throughout the Northeast have always dealt with ISI as a virtual alter ego of CCC with respect to the purchase and use of CCC products."

Certainly, ISI is not CCC. Nonetheless, we are satisfied that the trial court had sufficient evidence to find that the relationship between ISI and CCC satisfied the *Neptune T.V.* standard: "Under these circumstances * * * the extent of [CCC's] authorization to [ISI] to use the [CCC] name was sufficient to constitute a license as contemplated by the Act." 190 *N.J.Super.* at 161, 462 *A.*2d 595.

## C.

Does the record support the trial court's finding that ISI has a "community of interest" with CCC?

As noted at the outset of our opinion, the ambiguous "community of interest" inquiry is the most problematic issue in this case. The community-of-interest requirement addresses the inequality of bargaining power between the parties and is critical in distinguishing franchises from other types of business relationships. Nevertheless, only one New Jersey state court, in *Neptune T.V.*, *supra*, has discussed the appropriate definition of community of interest. The court in *Neptune T.V.* found that the community-of-interest inquiry emphasizes the "vulnerability of the alleged franchisee to an unconscionable loss of his tangible and intangible equities." 190 *N.J.Super.* at 165, 462 *A.*2d 595. Because the plaintiff in *Neptune T.V.* lacked those features, that court, after ruling there had been a "license to use a trademark," found that the business relationship did not constitute a franchise. *Id.* at 167, 462 *A.*2d 595.

CCC argues that it does not share a community-of-interest with ISI. Relying on *New Jersey American*, *supra*, 875 *F.*2d 58, CCC contends that what makes the true franchisee unique and in need of the Act's protection is the vulnerability that arises because the franchisee is required to make substantial *franchise-specific* investments "that are * * * valuable [only] if [the franchisee] remains a licensee" of that particular franchise. *Id.* at 62. Usually those investments are tangible capital investments, such as "a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs." *Ibid.* For example, McDonald's franchisees were required for many years to purchase and install "Golden Arches," which were of little value if the franchise were lost. Franchise-specific investments may also constitute intangible assets, such as the business goodwill associated with operating under the franchisor's name. *Ibid.*

The Act's concern is that once a business has made substantial franchise-specific investments it loses all or virtually all of its original bargaining power regarding the continuation of the franchise. Specifically, the franchisee cannot do anything that risks termination, because that would result in a loss of much or all of the value of its franchise-specific investments. Thus, the franchisee has no choice but to accede to the demands of the franchisor, no matter how unreasonable those demands may be. *Id.* at 62–63.

█ CCC argues that ISI has not placed itself in the vulnerable position of a genuine franchisee because it has not made substantial franchise-specific investments. CCC claims that ISI presented no evidence that it has made non-transferable capital investments in buildings, equipment, signs, or anything else specific to CCC. In particular, CCC points to the following facts in support of its position:

- ISI's only office is an ordinary commercial office building in Hackensack; if terminated, ISI could use that office for many types of businesses or sublease it to some other party.
- ISI does not maintain any CCC products in its inventory, so there is no possibility that ISI would have stranded inventories if terminated. Ordinarily, ISI does not order products from CCC until it already has a sales order from an end user.
- ISI has not invested in any signs to identify its office as that of a CCC "franchisee." [ ]ISI does not put the CCC logo or trademark on its office door or directory.
- While ISI has purchased some CCC equipment and software for its own use (that is, for demonstration purposes or to provide timesharing services), the investment is minimal, easily transferable, and [ ]was not required by the Reseller Agreement.

Although acknowledging that ISI has developed goodwill for CCC and has benefitted CCC in that respect, CCC argues that ISI's goodwill investments are not of the type that the Act protects. CCC relies on *New Jersey American, supra,* for the proposition that the Act is concerned only with goodwill investments that are franchise-specific in that the goodwill is tied to and dependent on the continued use of some sort of asset

unique to the franchise, such as the franchisor's trademark or the franchise place of business. 875 *F.*2d at 62.

To develop goodwill generally for a product cannot be enough to create a community of interest. Otherwise, any licensee distributing a brand-name product could claim it has a community of interest with its supplier. For example, a department store selling Sony name products could claim a community of interest with the manufacturer despite the fact that the department store's goodwill investments are not intimately tied to the manufacturer and therefore lack the economic character of genuine franchise investments.

As noted, the leading New Jersey case that interprets the "community of interest" standard is *Neptune T.V., supra,* 190 *N.J.Super.* 153, 462 *A.*2d 595. There, an appliance-repair business entered into a service contract with a manufacturer of microwave ovens whereby it became an "authorized Litton service source" for Litton ovens. *Id.* at 156, 462 *A.*2d 595. In addressing whether a community of interest existed between the parties, the court focused on the "context of the nature of franchising and the abuses to which this form of business enterprise is singularly susceptible." *Id.* at 161, 462 *A.*2d 595. The court found that the community-of-interest standard "is based on the complex of mutual and continuing advantages which induced the franchisor to reach his ultimate consumer through entities other than his own which, although legally separate, are nevertheless economically dependent upon him." *Id.* at 163, 462 *A.*2d 595.

Returning to the conceptual framework of *Shell Oil, supra,* 63 *N.J.* 402, 307 *A.*2d 598, and the Act's original purpose, the court concluded that what characterizes the community of interest is the potential for abuse that is triggered when the "reputation and good will of the network, created primarily by the efforts of each of the individual franchisees, passes back to the franchisor without compensation to the franchisee." *Neptune T.V., supra,* 190 *N.J.Super.* at 164, 462 *A.*2d 595. The

court summarized its views of the "broad, elastic and elusive" concept of community of interest as reflecting a "symbiotic character of a true franchise arrangement and the consequent vulnerability of the alleged franchisee to an unconscionable loss of his tangible and intangible equities." *Id.* at 165, 462 *A.*2d 595. The Third Circuit recently echoed that reasoning: "[C]ommunity of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skill that will be of minimal utility outside the franchise." *SnyderGeneral, supra,* 944 *F.*2d at 1143.

The *Neptune T.V.* court concluded that no community of interest existed between the parties in that case because their relationship "lacked * * * the symbiotic character of a true franchise arrangement." 190 *N.J.Super.* at 165, 462 *A.*2d 595. Although the contract had authorized Neptune T.V. to represent and hold itself out as an "authorized Litton service source" in its advertising, letterheads, calling cards, and service vehicle markings, no community of interest existed because Litton's sole interest in the repair business was that Neptune perform the repairs in a satisfactory manner. *Id.* at 167, 462 *A.*2d 595. Litton had no interest in the volume of plaintiff's business, and its own interests were best served if its products required as few warranty repairs as possible. *Ibid.* Litton did not profit from nor had it performed its business through the repair operations, and Neptune did not contribute toward building Litton's business. *Ibid.* Furthermore, Litton's business accounted for only thirty-eight percent of Neptune's income. *Id.* at 157, 462 *A.*2d 595. Hence, Neptune lacked an independent and continuing financial interest in Litton's business and was not particularly susceptible to abuse as a result of any inequitable-financial leverage between the parties. *Id.* at 167, 462 *A.*2d 595.

Because the New Jersey Legislature had not defined "community of interest" in the Act, the *Neptune T.V.* court looked

to other jurisdictions' interpretation of the community-of-interest requirement. The fullest discussion of that requirement is found in *Ziegler Co. v. Rexnord, Inc.*, 139 *Wis.*2d 593, 407 *N.W.*2d 873 (1987), *reh'g granted on other grounds*, 147 *Wis.*2d 308, 433 *N.W.*2d 8 (1988). In that case the community-of-interest requirement was part of Wisconsin's Fair Dealership Law. See *Wis.Stat.* § 135.02(3) (1991). In *Ziegler*, the court said that "[t]he legislature consciously defined the phrase community of interest to encompass an extraordinarily diverse set of business relationships not limited to the traditional franchise. * * * '[I]n determining whether a dealership exists, courts should not focus solely on the telltale trappings of the traditional franchise.' " *Id.*, 407 *N.W.*2d at 878 (quoting *Bush v. National School Studios, Inc.*, 139 *Wis.*2d 635, 407 *N.W.*2d 883, 890 (1987)).

The *Ziegler* court concluded that although the percentage of income derived from a particular supplier is an important indicator of a community of interest, the community-of-interest requirement "cannot be reduced to a mathematical equation." *Ibid.* Rather, one guidepost to determine the existence of a community of interest is whether there is a "continuing financial interest" between the companies. *Ibid.* The court stressed that that "requirement contemplates a shared financial interest in the operation of the dealership or the marketing of a good or service." *Ibid.* In addition, a community of interest is shown by "interdependence" between the parties, which refers to the "degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.*, 407 *N.W.*2d at 879. Thus, a dealer must "demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the [dealer's business]." *Ibid.*

States with franchise-practice acts comparable to the New Jersey Act have employed similar definitions of community of interest. For example, Washington's Franchise Investment Protection Act defines a community of interest as "a continuing

financial interest between the franchisor and the franchisee in the operation of the franchise business." *See Wash.Rev.Code* 19.100.010(2) (1991). In *Lobdell v. Sugar 'N Spice, Inc.*, 33 *Wash.App.* 881, 658 *P.*2d 1267 (1983), the court found the requisite community of interest between a company that had been granted a candy distributorship for certain counties and the seller of those distributorships. The parties' agreement evidenced a sufficient continuing financial interest in the resale of the merchandise to prove a community of interest because it contained an agreement to purchase trade-name merchandise as well as a supply contract for a definite term. *Id.*, 658 *P.*2d at 1274. In addition, the distributor's financial interest was evidenced by its contractual obligation "to maintain an ample supply of and diligently promote company products." *Ibid.*; *see also Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc.*, 308 *N.W.*2d 490, 492 (Minn.1981) (finding a sufficient community of interest under Minnesota franchise act between a muffler company and an exclusive dealer when the dealer sold and installed mufflers and tail pipes according to the manufacturer's specifications); *Martin Investors, Inc. v. Vander Bie*, 269 *N.W.*2d 868, 874–75 (Minn.1978) (finding a sufficient community of interest under Minnesota franchise act between a computer-service company that matched the needs of potential borrowers to potential lenders and a consultant who sold the system, when the computer service company had a contractual right to one percent of the proceeds of each loan placed by the consultant).

The interpretations of community of interest suggested by the *Neptune T.V.* and *Ziegler* courts are similar. Both courts look beyond the "telltale trappings of the traditional franchise." *Ziegler, supra,* 407 *N.W.*2d at 878. In *Neptune T.V.*, the court suggested considering whether a "symbiotic relationship" exists between the parties. That analysis is similar to the "interdependence" requirement urged by the *Ziegler* court and takes into account the extent of the licensor's control and the licensee's economic dependence discussed by other courts. *See*

*SnyderGeneral, supra,* 944 *F.*2d at 1140. In addition, the "continuing financial interest" requirement articulated in *Ziegler,* by emphasizing that the franchisee "demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person," *Ziegler, supra,* 407 *N.W.*2d at 879, echoes the extent of the franchise-specific investment discussed by other courts as a hallmark of the franchise relationship. *See New Jersey American, supra,* 875 *F.*2d at 62.

CCC's experts, Professors Janusz A. Ordover and Carl Shapiro, emphasize the transferability and invulnerability of ISI's franchise-specific investments. The joint declaration of Professors Ordover and Shapiro maintains that in order to conclude that ISI is a franchise, one must find that ISI made specific investments in CCC products that are "intimately tied" to a license granted by CCC. Professors Ordover and Shapiro aver that all investments made in the furtherance of a business enterprise do not necessarily rise to the standard of franchise-specific investments. They describe ISI's investments as "relationship investments," which are not sufficient to give rise to an inference of the existence of a franchise because they are not "vulnerable to opportunistic behavior by CCC" and are not "intimately tied to ISI's status as a licensee."

Professors Ordover and Shapiro reason further that the training of ISI's personnel, although an investment, is transferable to non-CCC products. They assert that ISI's goodwill investments in CCC will not be lost in the event of a termination, because ISI has always operated under its own name and its customers are aware of its independent relationship. Thus, the Professors reason that ISI is not a franchise because ISI has made merely the typical investments that a distributor must make in order to be "knowledgeable about a manufacturer's products that the distributors sell."

Despite the affirmations of CCC's experts, countervailing evidence was submitted to the trial court that suggests ISI has

made franchise-specific investments. For example, the Microhosts that ISI purchased from CCC for demonstrating CCC's software and Courseware involved an investment of approximately $100,000. In the event of a termination, ISI would not be able to resell the Microhosts because it would be prohibited from licensing the CCC software and Courseware, and without the CCC software and Courseware the Microhosts are essentially useless. In addition, if terminated by CCC, ISI has no alternative line of products that it could substitute and sell in place of the CCC product line. For close to twenty years, ISI has persuaded its customers to choose the CCC system. The goodwill and contacts that Professors Ordover and Shapiro believe ISI could continue to exploit would vanish in the event of a termination. ISI argues that had it lost its status as a CCC distributor, ISI's competitors, including CCC, would denigrate ISI with references to its prior endorsement of the CCC product line. ISI argues that to sell CCC products in New Jersey, New York, and Massachusetts, and at the same time sell competitive products throughout the Northeast would be impossible.

ISI emphasizes the many "sunk investments" that it has made in the sale of CCC products that are non-transferable. In particular, ISI recites the following as "sunk investments": at least $250,000 for the purchase of Microhosts and Microhost upgrades; at least $30,000 for the purchase of CCC hardware ("Graphics Servers") that ISI has given to potential customers as an incentive for future purchases of CCC products; the purchase of numerous CCC computer terminals that ISI has donated to school districts as an incentive for future purchases of CCC products; the cost to ISI of conducting studies for many school districts with respect to the use of CCC products. ISI views all those investments as non-transferable.

ISI asserts that the most critical asset in the form of goodwill it has developed for CCC's benefit is the "installed base of clients" in the Northeast. Rarely, argues ISI, will a school district switch from one integrated-learning system to another. Therefore, on-going profits result from the customer base con-

tinually renewing their licenses and upgrading or expanding their systems.

ISI submitted confidential documents of the Kidder–Peabody Company, CCC's exclusive financial advisor, to the trial court, which we will not discuss in detail. Those documents described CCC's Courseware as "the industry standard." That analysis noted that ninety-five percent of CCC's customers renew their curriculum leases each year and that over the years most customers have expanded their systems. That confidential information emphasized further that "CCC currently has an installed base of more than 300 systems and 13,000 terminals in 1,000 schools nationwide, which the company estimates constitutes a fifty-five percent market share of the entire [computer assisted instruction] industry." That report describes CCC as having "a dominant market system."

ISI argues that it is vulnerable to CCC's opportunistic behavior because all of the future profits that are generated from the installed base in the Northeast, with the exception of the states of New York, New Jersey, and Massachusetts, will accrue to CCC. Moreover, CCC will reap the benefit in those states of all the goodwill and various projects that ISI has undertaken to generate additional sales.

ISI's and CCC's interdependence is evidenced in various ways. CCC controlled ISI's business by obligating ISI to "direct all of its energies and resources to developing a demand for the [CCC] products," and by prohibiting ISI from developing or designing any products that might compete with CCC products in any location. Therefore, ISI was unlike a department store that could sell both Sony and Zenith televisions or market both Apple and IBM computers. ISI sold only one computer-assisted-learning system—CCC's. Hence, ISI could develop only a clientele that was wedded to the CCC productline.

CCC required ISI to maintain at least four full-time sales representatives and to maintain adequate facilities to promote

and sell CCC's products. ISI was required to submit monthly-sales-forecast reports, and CCC retained the right to monitor ISI's performance by inspecting ISI's books. CCC trained ISI marketing personnel and imposed restrictions on the way that ISI could market its supplemental products. CCC also controlled the quality of ISI's services by requiring ISI to prepare the customer site for installation in accordance with CCC specifications, and to maintain training programs for CCC product users.

In addition, ISI and CCC jointly cooperated in sales, marketing, and maintenance activities. ISI and CCC personnel jointly represented CCC products at educational conventions. CCC supplied ISI with brochures and with information regarding potential customers within its territory. Both CCC and ISI jointly cooperated to resolve maintenance problems and shared costs associated with model-demonstration projects for prospective customers. CCC's promotional literature described ISI's Hackensack office as a "CCC regional office." As noted, the evidence revealed that ISI customers considered ISI and CCC as synonymous.

Finally, CCC prohibited ISI from selling any products which are competitive with CCC's products. CCC required ISI to use its "best efforts" to sell CCC's products. ISI was obligated to use "all of its energies and resources to developing a demand" for CCC's products. CCC granted ISI the right to sublicense the CCC copyrighted Courseware. And perhaps most important, ninety-seven percent of ISI's revenue came from the sale of CCC's products.

In the light of this record, the CCC–ISI relationship differs markedly from that described in *Neptune T.V., supra,* 190 *N.J.Super.* 153, 462 *A.*2d 595, in which the purported franchisee repaired the products of appliance manufacturers. Furthermore, unlike this case, the appliance repair service in *Neptune T.V.* was fully transferable. Nor is the CCC–ISI relationship like the relationship in *Colt Industries, supra,* 844 *F.*2d 117, in

which the purported franchisee had a non-exclusive distributorship and was subject to little or no control by the manufacturer. Nor is the CCC–ISI relationship like the relationship in *New Jersey American, supra,* 875 *F.*2d 58, where the distributor used many suppliers of brake linings. Finally, the relationship in this case differs from the one in *SnyderGeneral, supra,* 944 *F.*2d 1131, where the distributor's air conditioning sale and service business was fully transferable. The distributor in *SnyderGeneral* could sell and repair other brands of air conditioners as well as other similar refrigeration or heating equipment.

Because of the extraordinary and intricate relations that arise in the distribution of computer products, a "close symbiotic relationship" arises almost of necessity between manufacturers and distributors or resellers. *See* Kennedy A. Brooks, *VADs, VARs, and Authorized Dealers—Do the Franchise Laws Apply to the Computer Industry?,* 12 *Hastings Comm. & Ent.L.J.* 33 (1989). A computer distributor or reseller "whose business is focused on, if not completely dedicated to, the hardware of a particular manufacturer is unlikely to resist initial manufacturer demands and even less likely to resist future shifts in the manufacturer's policies or requirements." *Id.* at 35. This symbiotic relationship is described by *Neptune T.V., supra,* 190 *N.J.Super.* at 160, 462 *A.*2d 595, as a "hallmark of the franchise relationship."

In short, we cannot say that the trial court erred in finding that the CCC–ISI relationship showed a community of interest.

## VI

If there is a New Jersey franchise, does the Act have extraterritorial reach to the franchise activities in states other than New Jersey?

 This question is closely related to the initial choice-of-law question discussed in Part III, *supra* at 341–346, 614 *A.*2d at 133–135. If New Jersey law, rather than California law, applies, does the application of New Jersey law stop at New

Jersey's border? Recall that the Chancery Division reasoned that although the Legislature did not intend that the Act's provision apply extraterritorially, the parties had given the law that effect. The reasoning echoes that of a Florida court that ruled that a Florida Mercedes dealer could invoke New Jersey's Franchise Practices Act because the New Jersey subsidiary of Mercedes that granted the Florida dealership had expressly made the New Jersey law applicable to the contract. *Mercedes–Benz of N. Am. v. Department of Motor Vehicles*, 455 *So.*2d 404 (Fla.Dist.Ct.App.1984).

We are not so certain that the same analogy can be drawn here. Surely nothing indicates that CCC intended or agreed that the New Jersey law would cover its activities in the sister states of New Jersey. Hence, we are remitted to the question of whether the New Jersey Legislature intended the Act to apply to franchise activities outside of the state. To return to the illustration that we gave in the choice-of-law section of this opinion, *supra* at 344–345, 614 *A.*2d at 134–135, would the Legislature have intended to protect a New Jersey businessperson who had invested substantial assets in a New Jersey-based hub of a multi-state franchise operation?

In some measure the answer to that question depends on the extent of State power as lawmakers may have understood it. Obviously, New Jersey has no power, and therefore no interest, to regulate commerce that occurs entirely beyond its borders. *See Healy v. Beer Institute, Inc.*, 491 *U.S.* 324, 109 *S.Ct.* 2491, 105 *L.Ed.*2d 275 (1989). In *Healy*, a Connecticut statute controlling beer pricing attempted to regulate the price of liquor sold outside of the state by equating that price with the price of liquor sold in the state. The Supreme Court held that the statute violated the Commerce Clause because it had the effect of controlling commercial activity occurring wholly outside Connecticut and it facially discriminated against interstate brewers and importers, thus not advancing the state's claimed justification of insuring the lowest in-state beer prices. *Ibid.; see also Edgar v. MITE Corporation*, 457 *U.S.* 624, 102 *S.Ct.* 2629, 73

*L.Ed.*2d 269 (1982) (holding that an Illinois statute regulating tender offers to shareholders beyond Illinois borders was impermissible burden on interstate commerce that outweighed its putative local benefits to in-state corporations).

The feature that distinguishes the *Edgar* decision from a case such as ours is that the Illinois Takeover Act "could be applied to regulate a tender offer which would not affect a single Illinois shareholder." *Id.* at 642, 102 *S.Ct.* at 2640, 73 *L.Ed.*2d at 283. Thus, the Court reasoned that the Commerce Clause precluded the application of a state statute to commerce that took place wholly outside of Illinois' borders. *See also Healy, supra,* 491 *U.S.* at 337, 109 *S.Ct.* at 2500, 105 *L.Ed.*2d at 289 ("Connecticut statute has the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State").

The same analogy, however, does not apply here. To the extent that it is applicable, the New Jersey Act regulates in-state conduct that has out-of-state effects. For example, in *Mon–Shore Management, Inc. v. Family Media, Inc.,* 584 *F.Supp.* 186 (S.D.N.Y.1984), the defendants argued that the New York Franchise Sales Act could not be applied to a franchise offer to franchisees in Pennsylvania and New Jersey. That court, however, held that to apply the New York Franchise Sales Act even though it regulated conduct in sister states was appropriate, because "an important aspect of a particular franchise transaction—an offer to sell or buy, or actual sale—occurs in the state, or *the franchise will operate in the state, or the franchisee resides here.*" *Id.* at 191 (emphasis added). The court reasoned that a state statute that affects interstate commerce will be upheld so long as it " 'regulates evenhandedly to effectuate a legitimate local public interest and its effects upon interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *Id.* at 190 (quoting *Pike v. Bruce Church,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970)). So too here, in contrast to *Edgar,* the State

regulation is applicable only to specific transactions affecting New Jersey, *i.e.*, franchises that have a "place of business" in New Jersey.

Were it otherwise, nearly every aspect of substantive state law would be disabled from affecting the conduct of multi-state corporations. When New Jersey law imposes a legal duty on the volitional behavior of a contracting party, that ruling will often have effects beyond state boundaries. For example, if the issue in this case were that of straight contract law, *i.e.*, had the contract precluded termination of the out-of-state territory, the New Jersey common law upholding the contract would be regulating commerce that takes place wholly outside of the state's borders. In terms of state power, whether state contract law or state statutory law is applied to the in-state activity makes no difference. *See Cipollone v. Liggett Group, Inc.*, 505 *U.S.* ——, ——, 112 *S.Ct.* 2608, 2635, 120 *L.Ed.*2d 407, 445 (1992) (Scalia, J., concurring in part, dissenting in part) (declaring that any legal duty imposed on volitional behavior is one imposed by law).

Another way of looking at the extraterritorial reach of the statute is in the context of due-process limitations on state choice of law. See Lea Brilmayer and Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 *Harv.L.Rev.* 1217 (1992) (Brilmayer and Norchi). The leading case dealing with due-process limitations on state choice of law is *Allstate Insurance Co. v. Hague*, 449 *U.S.* 302, 101 *S.Ct.* 633, 66 *L.Ed.*2d 521 (1981). The authors summarize the *Hague* formulation thus: "[D]ue process [in choice of law] requires 'contacts' with the forum, 'interests' arising out of these contacts, and 'fairness' to the defendant." Brilmayer and Norchi, *supra*, 105 *Harv.L.Rev.* at 1242. That test echoes the Commerce Clause test of *Pike v. Bruce Church* in terms of the legitimacy of the local interest and reasonableness of the regulation.

The proposition is "fairly well established that a state may regulate its residents, even when they are acting outside of the state." *Id.* at 1241 (discussing *Skiriotes v. Florida,* 313 *U.S.* 69, 61 *S.Ct.* 924, 85 *L.Ed.* 1193 (1941)). In *Skiriotes,* the State applied its law to one of its residents who, while outside the state's territorial waters, had violated environmental regulations. The Supreme Court upheld the State's action. *Ibid.; Skiriotes, supra,* 313 *U.S.* at 79, 61 *S.Ct.* at 937, 85 *L.Ed.* at 1201. A State's power over its own citizens should extend to protection of its own citizens' rights when dealing with others even though there may be incidental effects in other jurisdictions.

When analyzing the constitutionality of a statute with incidental extraterritorial effect, legislative intent and constitutional power (under the Commerce and Due Process Clauses) will tend to merge. At its core, the New Jersey Franchise Practices Act is meant to deal with the unconscionable business practices affecting New Jersey franchises. Under the *Hague* formulation we surely find "contacts" with the forum, "interests" arising out of those contacts, and "fairness to the defendant" in the statute.

Fairness to the defendant is implicit in the statute's requirements. By definition, the Act, and particularly its community-of-interest requirement, is intended to protect business parties who made a franchise-specific capital investment of either goods or services in New Jersey. *See Westfield Centre Serv., Inc. v. Cities Serv. Oil Co.,* 86 *N.J.* 453, 432 *A.*2d 48 (1981) (inequities that Legislature was trying to correct under the Act resulted from unequal bargaining power of the parties, leading to unconscionable termination provisions that imperiled innocent franchisees with substantial losses of their investments). Thus the statute's own terms, including the community-of-interest and good-cause requirements, will allow the application of the Act only in situations in which there are "contacts" with the forum, "interests" arising out of those contacts, and "fairness to the defendant" in the sense that a defendant who acts

fairly with a franchisee need fear no oppressive regulation. Therefore, the Act's own terms curtail any impermissible extraterritorial effect and ensure its constitutionality under Commerce Clause or due-process analysis despite some incidental extraterritorial effects.

As noted, a critical factor in this case is the installed base of customers that ISI has built up over a twenty-year period. Because of the peculiar relationship between the hardware and the software, to terminate the franchise arrangements could be devastating within that customer base and could allow the franchisor unconscionably to reap the harvest of the franchisee's long years of effort. But a termination might not be equally devastating in all jurisdictions. The Act defines "good cause" for termination as "failure by the franchisee to substantially comply with those requirements imposed upon [it] by the franchise." *N.J.S.A.* 56:10–5. To the extent that the franchisee has not met any imposed requirements to develop the franchise in the foreign jurisdiction, there may be good cause for termination. In order to resolve the issue of "good cause" (the franchisee's failure substantially to comply with imposed requirements), the factfinder will inevitably have to weigh the interests, including the percentage of sales in those jurisdictions to be terminated and the franchisee's installed base of customers, goodwill, and other investments attributable to that jurisdiction in relation to the franchise-specific investment of goods or services in New Jersey. If the franchisee will suffer no "threat to the health" of its business, *supra* at 360, 614 *A.*2d at 143, by loss of those jurisdictions (unlike the hypothetical Montvale car dealer stripped of its customer base in New York), invocation of the Act's protection against unconscionable conduct may not be warranted.

The computer-aided instruction industry has apparently entered or is about to enter an entirely new phase in which the principal product of CCC will be the intellectual content of its software—its curriculum programs. The hardware-software relationship may become less dominant, thereby diminishing the

importance of the installed base of customers. However, the trial court, as discussed in Part V C, *supra* at 355–366, 614 *A.*2d at 140–145, did not err in finding on this record that the CCC–ISI relationship showed a community of interest sufficient to invoke the Act's protections and require evaluation of the "good cause" asserted to justify the termination.

## VII

## CONCLUSION

In many ways this case illustrates the profound difficulties of encapsulating a concept of economic fairness in statutory language. This case fulfills the prophecy of the first speaker at the 1971 hearing on the Franchise Practices Act. Noting that franchising had been with us a long time and embraces *many types* of relationships and distribution techniques, involving all kinds of products and services, he ruefully predicted that "this bill delegates to the courts the power to decide, on a case-by-case basis, whether a person has a right to use someone else's trade name or trademark as long as he so chooses." *Hearing on A. 2063, supra,* at 3–4 (testimony of Peter Dorn, Secretary of the New Jersey State Chamber of Commerce). He posed a series of hypothetical questions that he foresaw under the Act, and asked: "Must the validity of these, and many similar provisions, which are common to present day franchising agreements, be tested in courts before there can be any certainty that they will not bestow a franchise for as long as the franchisee chooses to retain it * * *?" *Id.* at 4.[6] In this case, the answer to that question appears to be "yes." However, because this is the first time the Court has addressed such questions in detail, we doubt that, in general, parties are left with such uncertainty. All members of the Court agree that the issues are to be decided under New Jersey law. Concern-

---

[6] We omit reference to a treble-damage provision that was deleted from the final bill.

ing the application of that law to the facts, a factfinder might possibly have reached a different result in this case because the issues are indeed closely balanced. Moreover, only part of the case has been decided. Obviously, in the somewhat unusual posture of this case our courts were not called on to decide all of the issues in dispute, such as whether ISI had voluntarily surrendered its claims in certain states, *supra* at 330, 614 *A*.2d at 127, or whether CCC had imposed "unreasonable performance standards" on ISI, *ibid.*, or even whether CCC had "good cause" under the Act to terminate the franchise in the foreign jurisdictions. All that the Chancery Division adjudicated was that the relationship between the parties constituted a "franchise" and that that relationship was subject to the Act.

The startling technological changes of the recent era will perhaps occasion legislative review of the Act. "The growth of the computer industry has been fast-paced and manufacturers need flexibility and freedom from unreasonable contractual restraints in order to respond to rapidly changing markets." Brooks, *supra*, 12 *Hastings Comm. & Ent.L.J.* at 35 (footnote omitted). Yet, the author asserts "[t]hese conflicts between powerful manufacturers and weaker [distributors] * * * are the exact types of issues that the franchise laws were designed to regulate." *Ibid.* For now, courts must attempt to determine on a "case-by-case basis" the nature of the relationship and the just obligations of the parties to the franchise contract. Absent a compelling sense of inequity or injustice, courts do not seek to reorder the contracts of private parties. Such matters are best left to the sound economic judgment of the contracting parties. The New Jersey Franchise Practices Act is not a trap for the unwary. We are certain that contracting parties, even in a rapidly evolving industry such as the computer industry, can develop performance standards that will suitably gauge the franchisee's performance and whether it has fulfilled the expectations of the contract. No one has questioned that if product sale quotas are not met or product is disparaged, a franchise should justly be terminated. *See Amerada Hess Corp. v.*

*Quinn,* 143 *N.J.Super.* 237, 362 *A.2d* 1258 (Law Div.1976) (addressing termination of a franchise relationship for failure substantially to perform).

The judgment of the Appellate Division is reversed and the judgment of the Chancery Division is reinstated.

D'ANNUNZIO, J.A.D. (temporarily assigned), dissenting.

The New Jersey Franchise Practices Act (the Act) is very strong medicine. It provides in part that a franchise may not be terminated, cancelled, or non-renewed "without good cause." *N.J.S.A.* 56:10–5. The Act narrowly defines "good cause" as "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." *Ibid.* Thus, if a dealer deemed to be a franchisee under the Act is fulfilling its contractual obligations, its supplier would not be permitted to make good faith structural changes in the way it markets its product or service if the changes included termination of the dealer's "franchise." *See Westfield Centre Serv. v. Cities Serv. Oil Co.,* 86 *N.J.* 453, 432 *A.2d* 48 (1981); *New Jersey American, Inc. v. Allied Corp.,* 875 *F.*2d 58 (3d Cir. 1989); *Carlos v. Philips Business Sys., Inc.,* 556 *F.Supp.* 769 (E.D.N.Y.), *aff'd,* 742 *F.*2d 1432 (2d Cir.1983). Moreover, many attempts by a franchisor to terminate a franchise for good cause will result in litigation, in which a judge or jury will be permitted to review the franchisor's business decision.

In light of the Act's restrictions on a franchisor's business discretion and, therefore, on its ability to adjust to market developments and competitive pressures, and the Act's abrogation of common-law principles regarding termination and expiration of contracts, we scrupulously must avoid extending the Act's reach beyond the Legislature's intent. *See In re Miller,* 90 *N.J.* 210, 218–219, 447 *A.2d* 549 (1982) (declaring perpetual contractual performance is not favored in the law); *Bak–A–Lum Corp. v. Alcoa Building Prod., Inc.,* 69 *N.J.* 123, 129, 351

*A.*2d 349 (1976) (holding distributorship agreement terminable without cause on reasonable notice); *Owens v. Press Publishing Co.*, 20 *N.J.* 537, 550, 120 *A.*2d 442 (1956) (explaining that contract ceases to exist upon expiration of its term); *Karl's Sales & Serv. v. Gimbel Bros.*, 249 *N.J.Super.* 487, 495, 592 *A.*2d 647 (App.Div.) (holding that where right to terminate is absolute, it may be exercised without regard to motive or reasons), *certif. denied,* 127 *N.J.* 548, 606 *A.*2d 362 (1991); *cf. Oswin v. Shaw,* 129 *N.J.* 290, 310–11, 609 *A.*2d 415 (1992) (stating that doubt about meaning of statute in derogation of common law "should be resolved in favor of 'the effect which makes the least rather than the most change in the common law' " (quoting 3 Norman J. Singer, *Sutherland Statutory Construction* § 61.01, at 77 (4th ed. 1986)).

There is no doubt that the Legislature did not intend to reach all supplier-dealer relationships, despite the Legislature's use of language broad enough to include all such relationships. The parties and the majority concede as much. The use of broad language and the universal acceptance of the premise that the Act's reach is more limited than the literal application of that language place on the courts the burden of establishing the Act's limits in more concrete terms, consistent, of course, with the legislative intent. We must do this to decide the present case and to provide the business community with the objective standards it requires for predictability and guidance.

Although our task is to determine what the Legislature intended when it defined the word *franchise,* its use of that word is significant. *Cf. Gabin v. Skyline Cabana Club,* 54 *N.J.* 550, 554, 258 *A.*2d 6 (1969) (explaining that title of statute may indicate a legislative intent to apply narrowly the broad language of the enactment); *Samuel D. Wasserman, Inc. v. Klahre,* 24 *N.J.Super.* 143, 147, 93 *A.*2d 628 (App.Div.1952) (declaring that statute's title is relevant to its construction); *accord Casey v. Male,* 72 *N.J.Super.* 288, 297, 178 *A.*2d 249

(Law Div.1962).[1] There is a common understanding of what the word franchise evokes: fast food (McDonald's; Pizza Hut), ice cream (Carvel; Dairy Queen), hotels (Holiday Inn; Hilton), and automobile service facilities (AAMCO; Midas Muffler) are well known examples of business format franchises. See United States Department of Commerce, *Franchise Opportunities Handbook* (1991) (hereinafter *Opportunities* ) and Bryce Webster, *The Insider's Guide to Franchising* (1986) (for comprehensive lists of businesses offering franchises in the United States). Gasoline stations (Exxon; AMOCO), automobile dealerships (General Motors; Ford), tools (Mac Tools) and water conditioning (Culligan International) are examples of product franchising. *See Shell Oil Co. v. Marinello,* 63 *N.J.* 402, 409, 307 *A.*2d 598 (1973), *cert. denied,* 415 *U.S.* 920, 94 *S.Ct.* 1421, 39 *L.Ed.*2d 475 (1974); *Tynan v. General Motors Corp.,* 248 *N.J.Super.* 654, 591 *A.*2d 1024 (App.Div.1991), *certif. denied,* 127 *N.J.* 548, 606 *A.*2d 362 (1991), *rev'd in part on dissent,* 127 *N.J.* 269, 604 *A.*2d 99 (1992); *Opportunities, supra,* at 268–69. Manufacturing franchises are less well known, but the soft drink industry relies heavily on the franchising of beverage production. *Webster, supra,* at 6–7. I agree with the majority that those are the prototypes the Legislature envisioned when it adopted the Act. Indeed, the legislative history indicates that the New Jersey Gasoline Retailers Association and the New Jersey Automobile Dealers Association were principal supporters of the Act. Franchise Practices Act: *Hearing on A.2063,* Assembly Judiciary *Comm.,* 194th Leg., Sess. (1971).

The prototypes inform us of the legislative intent. The prototypes have two primary characteristics: the product or service is marketed primarily through brand-name recognition;

---

[1] The Act is titled: "An Act to prohibit unfair practices in franchising and supplementing Title 56 of the Revised Statutes." Compare, for example, the Wisconsin statute, which is titled the Wisconsin Fair Dealership Law. *Wis. Stat.Ann.* § 135.01 to 135.07 (1991). As its title implies, it is broader than the Act. It applies to contracts "by which a person is granted the right to sell or distribute goods or services." *Wis.Stat.Ann.* § 135.02(3).

the franchisee adopts the franchisor's trade name as its own name, presenting itself substantially as a unit of the franchisor. *See Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.*, 844 *F*.2d 117, 119 (3d Cir.1988); *Susser v. Carvel Corp.*, 206 *F.Supp.* 636 (S.D.N.Y.1962), *aff'd*, 332 *F*.2d 505 (2d Cir.1964), *cert. dismissed*, 381 *U.S.* 125, 85 *S.Ct.* 1364, 14 *L.Ed.*2d 284 (1965); *Finlay & Assocs. v. Borg–Warner*, 146 *N.J.Super.* 210, 219, 369 *A*.2d 541 (Law Div.1976), *aff'd o.b. on other grounds*, 155 *N.J.Super.* 331, 382 *A*.2d 933 (App.Div.), *certif. denied*, 77 *N.J.* 467, 391 *A*.2d 483 (1978); *see also Webster, supra,* at 4–5; Donald D. and Patrick J. Boroian, *The Franchise Advantage* 16–17 (1987); Harold Brown, *Franchising: Trap for the Trusting* 89 (1969). *But cf. Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc.,* 190 *N.J.Super.* 153, 160, 462 *A*.2d 595 (App. Div.1983) (defining "franchise" in terms of a public perception that licensor vouches for licensee).

The trial court in *Susser v. Carvel Corp., supra,* 206 *F.Supp.* at 640–41, aptly described some of the characteristics of a franchise:

> The plaintiffs' franchise agreements require the franchisees to operate their stores in accordance with a Standard Operating Procedure Manual (SOP). This SOP regulates the business of the operators in a number of respects. It describes the products which the operators may sell at their store, the advertising which they may use, the color they must paint their store, the hours when they must put on their lights, the amount of insurance they must carry, the colors of their employees' uniforms, and many other details. To the public the individual franchise operator appears to be part of a national organization which manufactures and distributes a limited type of products of uniform quality. The Carvel SOP refers to each store as "an integral part of the chain."
>
> ....
>
> ... The franchise system creates a class of independent businessmen; it provides the public with an opportunity to get a uniform product at numerous points of sale from small independent contractors, rather than from employees of a vast chain. The franchise system of operation is therefore good for the economy.
>
> However, the cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product....

It is this uniformity of stores and operation, and this advertising and the knowledge of the public of the uniformity and quality of the product that draws the business to the Carvel operators. The name Carvel constitutes a trademark of great value to the defendant companies and to the franchise operators.

The actual, or perceived, acceptance of a brand name in a national or regional market as representing a useful and quality product or service is what makes the franchise valuable to the potential franchisee. Through a franchise, the franchisee believes that it will reap the benefits of brand recognition that otherwise would be attainable, if at all, only through substantial effort and expense. It is this perceived value that gives a franchisor the upper hand and the ability to dictate the terms of its franchise. And it was that inequality of bargaining power and the resulting onerous terms frequently imposed on franchisees that moved many state legislatures to consider and enact statutes, similar to New Jersey's Act, purporting to protect franchisees. *See* Brown, *supra*.

The major benefit of a franchise—the franchisee's use, as its own, of the franchisor's trademark and trade name—becomes a major disadvantage if the franchise is terminated. On termination of a franchise, the franchisee cannot convert to its own benefit the goodwill it has helped to sustain by years of work. *See Shell Oil Co. v. Marinello, supra,* 63 *N.J.* at 409, 307 *A.*2d 598. Even if the terminated franchisee retains ownership of the physical plant and equipment, it cannot effectively capitalize on its years of effort by restyling its former nationally-recognized hamburger fast-food outlet as "Joe's Hamburger Palace," or, in the case of a manufacturing franchise, by producing a soft drink whose newly-created trademark and name are unknown to soft drink consumers.

The context in which the Legislature adopted the Act, *see Board of Educ., Asbury Park v. Hoek,* 38 *N.J.* 213, 231, 183 *A.*2d 633 (1962), and the "background circumstances revealing the evil sought to be remedied," *Oxford Consumer Discount Co. v. Stefanelli,* 102 *N.J.Super.* 549, 565, 246 *A.*2d 460 (App. Div.1968), persuade me that the first element of the definition

of franchise, "a written arrangement . . . in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristics," *N.J.S.A.* 56:10-3, refers to a license to use the trade name, etc. substantially as the licensee's own in circumstances in which the licensee presents itself as a unit, or the *alter ego*, of the licensor. *Cf. Roman v. Sharper*, 53 *N.J.* 338, 342, 250 *A*.2d 745 (1969) (holding that legislative intent effected "by adding inferentially" the phrase "qualified to vote" to the language of a statute authorizing recall elections). This formulation of the franchise definition, the prototype definition, objectively distinguishes a franchise from other supplier-dealership arrangements, thereby giving effect to the legislative intent and providing guidance and a greater degree of predictability to the business community. *Cf. Council of N.J. State College Locals v. State Bd. of Higher Educ.*, 91 *N.J.* 18, 36, 449 *A*.2d 1244 (1982) ("Statutes should be read in a reasonable manner to include only those situations legitimately contemplated by the Legislature.").

The prototype definition avoids the subjective and vague definition developed in *Neptune T.V. & Appliance Service Inc. v. Litton Systems, Inc., supra*, 190 *N.J.Super.* at 160, 462 *A*.2d 595:

> [T]he use of another's trade name in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee in respect of the subject of the trade name.

The *Neptune* definition is seriously flawed because it relies on the public's belief. In addition to the difficulty of proving what the public believes, the *Neptune* definition ignores the statute's reliance on the grant of authority from the licensor to the licensee. *N.J.S.A.* 56:10-3a. Under the Act's definition of a franchise it is the agreement between the parties that is controlling, not the public's possibly erroneous, and perhaps undeterminable, belief. Moreover, the *Neptune* definition introduces the new and imprecise element of vouching for the licensee's activity. That element suffers from the same infirmity as a

literal application of the Act's definition: it probably exists in all licensor-licensee relationships.

The majority is incorrect when it suggests that *N.J.S.A.* 56:10–4(3) precludes the prototype definition. That section provides that the Act applies only to a franchise ... "where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise." According to the majority, "the inclusion of independently-named businesses is implicit in the Act's definition of franchise by the Act's limitation to a franchise" which generates more than 20% of the franchisee's gross sales. *Ante* at 354, 614 *A.*2d at 140. The majority misunderstands the applicability of the 20% limitation. It is applicable to a franchisor who sells products complementary to the franchised product or who has multiple franchises. The operator of a neighborhood gasoline station franchised to sell a national brand of petroleum products may generate more than 80% of its gross sales from tires, batteries, accessories, and mechanical work, see *e.g.,* the facts in *Muha v. United Oil Co., Inc.,* 180 *Conn.* 720, 433 *A.*2d 1009 (1980), or may also be franchised to sell Goodyear tires, or to rent automobiles under a Hertz franchise. In those circumstances the franchisee does not do business in its own name; rather, it adopts the names of its franchisors and presents itself as units of each of the franchisor companies. If one (or more) of the franchises does not generate more than 20% of the franchisee's gross sales, then the Act is not applicable to that franchise.[2]

The relationship between CCC and ISI is not a franchise under the Act. The majority concedes "[t]hat ISI does not use CCC's name as its own.... ISI has always operated under its

---

[2] Multi-point automobile dealerships provide another example of multiple franchises. A dealer holding a franchise from a domestic manufacturer may also have a franchise to sell an import. If the import's sales do not exceed 20% of the dealer's total sales, then the Act is not applicable to that franchise. Other examples of the applicability of the 20% minimum to prototype franchise situations abound.

own trade name, and admits that it does not use CCC's name on its stationery, business cards, or on any business signs." *Ante* at 353, 614 *A.*2d at 139. Of great significance, not mentioned by the majority, is the fact that once ISI makes a sale, the contract of sale is between ISI and the customer.

The agreement between ISI and CCC gives ISI a limited right to the use of CCC's trade name and trademark. Section 6.02 of the Agreement obligates ISI to "promote CCC's name, trademark and logo *on the Products.*" (Emphasis added.) It also authorizes ISI, "subject to the provisions of Part 11 hereof, to use CCC's name, trademark and logo in its advertising, exhibits, trade shows, public relations materials and manuals *as the same relates to the Products.*" (Emphasis added.)

Section 6.03 establishes the boundaries of ISI's authority. It provides that ISI "shall not enjoy any rights in the CCC name, its trademark or logo" except as permitted under section 6.02. Part 11 more specifically restricts ISI's use of CCC's trademark. Pursuant to section 11.01, "ISI agrees that it shall only use, make reference to, or otherwise designate, either orally or in writing, CCC's trademarks or its licensors' trademarks, in the promotion or Sale of the Product." Section 11.02 imposes additional restrictions. It provides, in part, that when ISI uses CCC's trademark in connection with CCC's products, "ISI shall clearly indicate CCC's ownership of the trademark 'CCC'," and that "ISI shall not in any matter represent that it has ownership in the trademark 'CCC'." Finally, section 11.02 provides that "ISI will at no time adopt for use, without CCC's prior written consent, any word or mark which is similar to or likely to be confused with the trademark of 'CCC'."

The parties' agreement severely limits ISI's use of CCC's mark and name to the identification of the products it is selling as CCC products. The agreement does not authorize ISI to use CCC's name or mark as its own or to present itself as a CCC unit. Thus, not only does ISI not present itself as CCC, it is prohibited from adopting or using CCC's mark or name as its

own. Consequently, the first element of the definition of "franchise" has not been established. ISI is a dealer authorized to sell and service CCC's products; it is not a franchisee.

I would affirm the judgment of the Appellate Division.

Justice CLIFFORD joins in this dissent.

*For reversal and reinstatement*—Chief Justice WILENTZ, Justices HANDLER, O'HERN, STEIN, and Judge KING—5.

*For affirmance*—Justice CLIFFORD, and Judge D'ANNUNZIO—2.